14 P.(2d) 434

STATE v. BERRY et al.

No. 3757.

Supreme Court of New Mexico.

Sept. 14, 1932.

Barker & Fahy, of Santa Fé, for appellants.

E. K. Neumann, Atty. Gen., and Quincy D. Adams, Asst. Atty. Gen., for the State.

HUDSPETH, J.

The appellants were convicted of murder in the second degree in the district court of Rio Arriba county, and from the judgment and sentence to the penitentiary this appeal is prosecuted.

The information upon which the defendants were tried charges that the appellants "unlawfully, wilfully, feloniously, purposely, maliciously and of their deliberate and premeditated express malice aforethought, upon the person of one Miguel A. Sanchez, then and there being, did make an assault, and with force and violence, did beat, strike and wound him, the said Miguel A. Sanchez. and weaken and sicken him, the said Miguel A. Sanchez, and eject him, the said Miguel A. Sanchez, from a certain vehicle, to-wit, a sleigh, in such wounded, weakened and sickened condition, upon a lonely road between Tres Piedras and Tusas, New Mexico, in snow, cold and inclement and freezing weather, thereby exposing him, the said Miguel A. Sanchez, in a wounded, weakened and sickened condition, to loneliness, snow and cold, inclement and freezing weather and exposure, from the effect of all of which, he, the said Miguel A. Sanchez then and there languished, and on the same day, languishing did die."

On January 22, 1929, the appellant C. C. Stephens and the deceased, Miguel A. Sanchez, who were neighbors living near Truchas, went to the village of Tres Piedras some nine miles distant. Their means of conveyance was a bobsled, on which a wagon box had been placed, drawn by a team of horses. After spending six or seven hours in Tres Piedras, and after feed and groceries were loaded into the bobsled, they departed for home, accompanied by the appellant Charles Berry, the son-in-law of the deceased. The brief of appellee states: "The deceased left Tres Piedras for Truchas with the appel-

lants on a very cold night, January 22, 1929, about eight P. M. They were riding on a sled drawn by a team of horses. It was so cold that the appellant, Berry, was almost frozen and got off the sled at the house of Bonifacio Martinez. The appellant, Stevens, was so affected by the cold that, after reaching home, he was unable to be up for four days. * * *"

It appears the deceased, after crossing the Truchas divide in the sled, walked for about a mile in the direction of his home, and that his body was found, face down, in the snow by the mail carrier in the early morning of the following day.

The evidence against the appellant Stephens consisted of the finding of the body with the bruises thereon, and the testimony of Juan R. Gallegos, a half-brother of the deceased, as follows: "The conversation that Mr. Stephens and I had; he came to my house, and he said Mr. Gallegos, don't think that I did anything to Miguel Sanchez. And I said I have never accused you of anything. I was coming, he said; I was very cold, he said, when I was coming, and Charlie Berry and Miguel Sanchez were quarreling, and I have the lines, driving lines and driving the team, but I didn't understand their conversation and therefore I didn't take any interest in it. When we got to the place where Arvisto Martinez lives I was sitting in front, and Charlie Berry said I am going to get off here, and I turned around and I asked him for Mr. Sanchez, and he said to me, here he comes, don't worry. Then I twisted the lines around my knees, untangled the lines, and let the team go, depending that Charlie Berry, I told him—depending on Charlie Berry to take care of him. That is the way I said. That was all the conversation that we had. I forgot one thing that I asked him: Who started out with you from Tres Piedras, and he said Nobody, just the three of us alone."

Appellant Stephens had lived only two years in that vicinity and did not understand Spanish, the language in which Berry and the deceased conversed.

The evidence against appellant Berry, in addition to the condition of the body of the deceased, consisted of the fact that Berry was wearing the overcoat of the deceased on the morning of the 23d, and false statements made by him to two women to the effect that he was not with the deceased and Stephens on their trip from Tres Piedras to Truchas, but that he was on his way from a sawmill to Tres Piedras, and the testimony of Juan R. Gallegos, as follows:

"A. When I heard that Miguel Sanchez had stayed on the road I sent a boy to look for him on a sled, and about two hours afterward the boy returned and Mr. Berry was with him. I noticed that Mr. Berry was wearing the coat of Miguel Sanchez. I asked Mr. Berry what had happened and he said nothing. I told him, I said to him what have you done, and he said nothing. Then he turned around and said I am going to the house and he went. Later on they came with the body of Miguel Sanchez and at that time Charlie

Berry again came and I said to him, what have you done with Miguel Sanchez, and he said nothing. Then I asked what did you do with the coat of Miguel Sanchez, and he said I left it at the house.

"Q. What house? A. He didn't say what house; I understood him to mean at Miguel Sanchez' house; then Charlie Berry left and I didn't have any further conversation with him."

It is shown that, instead of leaving the coat at the house of Miguel Sanchez, appellant Berry left it at the house of appellant Stephens, who later gave it to the sheriff.

The wounds or bruises were described by the mail carrier as follows:

"A. He had a bruise on this left cheek and another small one on the nose.

"Q. What kind of bruises were those? A. I don't know; he had a purple mark right there. * * *

"Q. What was the mark on the nose? A. I think this was frozen, because it peeled off a little.

"Q. Now, did you notice any other marks, yourself, on that—on his body at that time? A. At that time; no sir."

The body was loaded into a sleigh in a cramped position and hauled to Tres Piedras, six miles, where it was taken out and taken into a pool hall. The witness was asked:

"Q. What was done with it there? A. We placed him in there and I went·on to Truchas. That is at the time that I was there a man came there first, an Anglo, and he placed a mirror in front of his nose and he didn't blur it, and I went on to the post office. When I returned they had opened his shoes.

"Q. They had the body inside the pool hall? A. Yes, sir; as soon as they placed him in there, they built a good fire to see if he was alive."

Later the body was loaded into a sled and hauled nine miles to Truchas, where an inquest was held, the body examined, and red marks on the legs discovered. This witness described these marks as follows: "Q. What marks were those? A. He had three bruises on his shin, small bruises on his shin, but on his left shin he had a big bruise, and he had another mark on this back part of his thigh."

There was no blood. The so-called bruises, except the one on the cheek were described as red spots, and no blood had been drawn from any of them. There was no expert testimony; no physician examined the body. Appellant Berry testified that Mr. Sanchez in Tres Piedras had invited appellant to go home with him, that they all started on the sled, and that about three miles out from Tres Piedras the deceased got off the sled, and further, as follows:

"Q. Well, what was the circumstances, tell the jury how—whether the sled was moving or standing? A. We stopped the sled and he got off and I put him back on again.

"Q. Then what did you do? A. Then we went a little further and he got off again and

I put him on the sled again, and then we went on the last time he got off and told us he wanted to walk.

"Q. How was he dressed at that time? A. He had on a leather jacket, a pretty heavy shirt, a couple of pair of pants and a pair of overshoes.

"Q. Did he have an overcoat there at that time? A. Yes, sir.

"Q. Where was the overcoat? A. I had the overcoat on.

"Q. How did you come to have it on? A. I put it on at Tres Piedras."

Appellant Berry, on cross-examination, testified in part:

"Q. You say the last time he got off was west of the top of the divide? A. Yes, sir.

"Q. On the Truchas side? A. Yes, sir.

"Q. Not on the Tres Piedras side? A. No, Truchas side.

"Q. When he got off—Why did he get off so often, did he tell you? A. Well, he wanted to walk.

"Q. And you kept putting him back on? A. Yes, sir.

"Q. Now, he wasn't very drunk? A. He didn't want to ride so we had to go on with him.

"Q. And if he wasn't very drunk, what do you mean when you say you put him back on? A. He didn't want to ride.

"Q. You just made him get back on? A. No.

"Q. Did you get out and argue with him and fight with him? A. No; didn't fight with him.

"Q. How did you put him back on? A. I put him on two or three times.

"Q. Well, did you lift him up and throw him on? A. I lifted him up and put him on.

"Q. And he told you that he wanted to walk? A. Yes, sir.

"Q. You finally decided you would let him walk? A. I thought that would be the best for him, if he wanted to walk; I thought he might get warm; I thought maybe he was cold or something.

"Q. Who did he tell that he wanted to walk? A. He told me and Stephens.

"Q. To both of you? A. Yes, sir.

"Q. Did you and Stephens have any conversation about letting him walk? A. I don't believe we did.

"Q. And from there you went to Florita's house? A. Yes, sir."

Appellants maintain that the evidence is insufficient to sustain the judgment. Appellant Berry is corroborated to some extent by the testimony of the mail carrier, who testified that there were no tracks around the body of deceased, and that he traced the course of deceased by his tracks from the point where the body was found for about three-quarters of a mile, and was asked: "Q. Now, did you see the tracks of any other people when you were following these tracks

of Miguel A. Sanchez? A. I didn't see any other tracks, but on the other side of the divide there were some more tracks."

He testified that the snow was trampled down pretty thoroughly; that there was no blood there. The witness located these tracks at about the place where appellant Berry testified that he had put the deceased back on the sled. There is no evidence that the deceased was ejected from the sled. It is a matter of common knowledge that men often walk for their own comfort in cold weather rather than ride on a sled or wagon. The state's witness expressed the opinion that the so-called bruise on the nose was caused by the cold; the face of deceased having been found buried in the snow. The purple spot on the cheek may have been caused by the cold. The red spots on the shins and the thigh, the largest of which was described as about the size of a silver dollar, and from none of which blood had been drawn, would not ordinarily be considered dangerous wounds or bruises, or that they contributed "either mediately or immediately to the death in a degree sufficient for the law's notice."

Homicide cases where death resulted in whole or in part from a supervening cause after the infliction of injuries by accused are collected in Territory v. Yee Dan, 7 N. M. 439, 37 P. 1101; Stephenson v. State (Ind. Sup.) 179 N. E. 633; and in People v. Kane, 213 N. Y. 260, 107 N. E. 655, L. R. A. 1915F, 607, Ann. Cas. 1916C, 685, and note.

Little comment is necessary on the absence of evidence from which it could reasonably be inferred that these bruises were the results of blows inflicted by the appellants, or either of them, under circumstances to render them criminally responsible. The shins of deceased might have come in contact with the wagon box when he was getting off the sled or being put back on, or he might have fallen in the snow. No motive has been suggested why appellants should have assaulted or ejected the deceased from the sled. They had crossed the divide and were descending; hence it could not have been that they desired to lighten the load.

The conduct of the appellant Berry in making false statements as to his whereabouts on the night of the death of deceased and the possession of the overcoat of the deceased are points dwelt upon by the Attorney General, but they are not, taken in connection with the other circumstances, sufficient basis for a reasonable inference that the appellants, or either of them, had assaulted the deceased or ejected him from the sled.

The Attorney General states: "In so far as the record shows, neither of the appellants, after deserting the deceased and leaving him on the road, ever exhibited any concern for his safety, although the weather was so cold that they themselves were almost frozen and the deceased had been abandoned in a partly intoxicated condition." And thus argues that it was the duty of appellants to care for the deceased. He cites Territory v. Manton, 7 Mont. 162, 14 P. 637, 29 C. J. p. 1096, states: "The omission or neglect to perform a duty resulting in death may con-

stitute murder where the omission was willful and there was deliberate intent to cause death, or where the omission must necessarily lead to the death, so willfully allowing one to be exposed to conditions which will probably result in death, where there is a duty to protect such person, constitutes murder."

■ Appellants are not charged with neglect to perform an act which it was their duty to perform. There must be a legal or contractual duty which appellants were bound to perform. Michie on Homicide, § 75; People v. Beardsley, 150 Mich. 206, 113 N. W. 1128, 13 L. R. A. (N. S.) 1020, 121 Am. St. Rep. 617, 13 Ann. Cas. 39. In this case the language of Mr. Justice Field in U. S. v. Knowles, 4 Sawy. 517, 26 Fed. Cas. No. 15,540, is quoted with approval as follows: "In the absence of such obligations, it is undoubtedly the moral duty of every person to extend to others assistance when in danger; * * * and if such efforts should be omitted by any one when they could be made without imperiling his own life, he would, by his conduct, draw upon himself the just censure and reproach of good men; but this is the only punishment to which he would be subjected by society."

■ The evidence against appellants is not substantial. Men should not be convicted on mere suspicion. Motion for a directed verdict of not guilty was made at the close of the state's case and overruled and exception allowed. The motion was not renewed, but, notwithstanding the failure of appellants to invite the ruling of the trial court on the motion at the close of the evidence, we are constrained to hold on the authority of State v. Armijo, 35 N. M. 533, 2 P.(2d) 1075, and State v. Garcia, 19 N. M. 414, 420, 143 P. 1012, that the conviction must be set aside.

The judgment of the trial court will be reversed, the verdict of the jury set aside, and the case remanded to the trial court, with directions to discharge the appellants from further prosecution under the information. It is so ordered.

BICKLEY, C. J., and WATSON and SADLER, JJ., concur.