STATE OF NORTH CAROLINA v. COLEY JAMES MASON AND
BELVIA JEAN MASON

No. 7321SC384

(Filed 13 June 1973)

**Homicide § 6— involuntary manslaughter — death of child by starvation —
sufficiency of evidence**

   Evidence was sufficient to submit the issue of involuntary man-
slaughter to the jury where it tended to show that defendants' child
died of starvation, that the house in which she was found was
unheated and filthy, that a large quantity of molded and rotten food
was found in the refrigerator in the house, that the male defendant
was gainfully employed and that the femme defendant's father had,
sometime prior to the day the child was found, advised his daughter
to take the child to a doctor.

ON *certiorari* to review judgment of *Armstrong, Judge,* 3
August 1972 Session of FORSYTH Superior Court.

In separate indictments defendants, husband and wife, were
charged with the murder of their two-year-old daughter, An-
tonia Elaine Mason (Antonia). The cases were consolidated for
trial and defendants pleaded not guilty. At the close of the
State's evidence, the court reduced the charge to involuntary
manslaughter. For their verdict the jury found both defend-
ants guilty of involuntary manslaughter and from judgments
imposing prison sentences, they gave notice of appeal. Defend-
ants were unable to perfect their appeal within the time allowed
by our rules and we granted certiorari.

   *Attorney General Robert Morgan by Ralph Moody, Special
Counsel, for the State.*

   *R. Lewis Ray for defendant appellants.*

BRITT, Judge.

Defendants assign as error the failure of the court to grant
their motions for nonsuit.

This appears to be a case of first impression in this juris-diction. The theory of the State's case is that defendants (1) in-tentionally failed to feed the child, or (2) culpably neglected to provide the child with food, care and medical attention, and that the child's death resulted therefrom.

In 4 Strong, N. C. Index 2d, Homicide, § 6, p. 198, we find:

> "Involuntary manslaughter is the unlawful killing of a human being, unintentionally and without malice, proxi-mately resulting from the commission of an unlawful act not amounting to a felony, or resulting from some act done in an unlawful or culpably negligent manner, when fatal consequences were not improbable under all the facts exist-ent at the time, *or resulting from the culpably negligent omission to perform a legal duty.*" (Emphasis added.)

G.S. 14-316.1(a) provides in pertinent part: "Any parent . . . to a child under 16 years of age who fails to exercise rea-sonable diligence in the care, protection, or control of such child, . . . shall be guilty of a misdemeanor."

In 40 Am. Jur. 2d, Homicide, §§ 89 and 90, pp. 382-384, we find:

> "Neglect on the part of one charged with the duty of supporting another to provide the necessary food, cloth-ing, and shelter to the dependent, resulting in the latter's illness and death, renders the person upon whom the duty rests guilty of culpable homicide, the grade of which de-pends upon the nature and character of the act or acts causing death. The crime is murder when the neglect is wilful or malicious, as where a parent intentionally with-holds the food necessary to sustain an infant's life, or abandons an infant in a remote place where it is not likely to be found so that it dies of exposure, or where a husband criminally neglects to shelter his wife when he is able to do so and knowingly leaves her to perish. On the other hand, the crime is manslaughter when the omission is not malicious but arises out of negligence, as where a parent, having the means at his command, negligently fails to pro-vide his child with food, clothing, or shelter, and the child dies in consequence. . . ."

> \*     \*     \*

> ". . . [I]t is quite generally recognized that a parent owes a legal duty to provide medical care to a minor un-

emancipated child, and that his violation of such duty may render him guilty of homicide."

Evidence for the State in the instant case tended to show:

In April of 1970, through action of the Social Services Department, Antonia was placed in a foster home. In August of 1971, at the request of defendants, she was returned to her parents to live in their home. At that time Antonia was toilet trained and in good physical condition. Some time later and prior to 8 January 1972, the feme defendant's father visited in defendants' home, noticed that Antonia was very thin and sickly looking; he advised his daughter to take the child to a doctor, she promised that she would but apparently never did.

Around 9:30 a.m. on 8 January 1972, pursuant to a telephone call from the feme defendant, two Winston-Salem police officers went to the apartment home of defendants. They found Antonia's dead body lying on a bed; there were no sheets on the bed but there was a bedspread thrown over her body. The child's body was in a doubled-up position with her pants pulled down around her knees. There was no heat in the house and the feme defendant stated she found the child dead at 9:00 a.m. Sores were found on the arm and rectum of the child. The house was fairly new but little or no heating equipment was present. The apartment was littered with trash and boxes; the bedroom was in a poor state of cleanliness with clothes scattered on the floor. In the closet there were children's clothes, wet with an odor of urine. In the kitchen police observed cockroaches on the walls and running over the floors; milk cartons were on the floor with bottoms eaten out of them. Police opened the door to the refrigerator and found it to contain a large quantity of molded and rotten food.

Dr. J. B. Dudley, a pathologist, testified: He performed an autopsy on the body of Antonia on 8 January 1972, beginning at 12:15 p.m. He found the body extremely emaciated, the cheeks sunken and drawn in. He found the neck, arms and legs to be quite thin and ribs protruding. He found blood about the genital portions and anus. The body generally was dirty and foul smelling with multiple scratch marks on the skin. His conclusion was stated as follows: "The findings are consistent with starvation. The stomach and proximal intestine contained no food. There is no evidence of any other significant disease." On cross-examination he testified that the body weighed 14 to

15 pounds and his conclusion was that the child died from starvation.

Testimony by defendants disclosed: The male defendant was gainfully employed; they purchased adequate food for the family but Antonia would not eat. They reported the fact that Antonia would not eat to a Social Service worker who said she would arrange for a psychiatrist to see Antonia but the worker never did call back. Defendants were planning to move to another housing unit and that accounted for the condition of the apartment; they were trying to get by with heat from electrical appliances including a small stove, a hot plate and a toaster until they moved.

We hold that the evidence was sufficient to show that the child's death resulted from the culpably negligent omission of defendants to perform their legal duty with respect to the child; therefore, the trial court did not err in overruling defendants' motions for nonsuit as to involuntary manslaughter and the assignment of error is overruled.

We have carefully considered the other assignments of error brought forward and argued in defendants' brief but finding them without merit, they too are overruled.

No error.

Judges CAMPBELL and BALEY concur.