[Crim. No. 29782. Second Dist., Div. Three. Aug. 10, 1977.]

THE PEOPLE, Plaintiff and Respondent, v.
JAMES RALPH BURDEN, Defendant and Appellant.

604

**COUNSEL**

Hugh Peter Bavaro, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, William R. Pounders and Michael Nash, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**POTTER, J.**—In a trial by jury, defendant was found guilty of murder of the second degree because of the death of his son, approximately five months old, caused by malnutrition and dehydration.

Three contentions are presented on this appeal: (1) the admission in evidence of postdeath colored photographs of the emaciated infant constituted prejudicial error; (2) a tape-recorded interrogation of defendant by the police should have been excluded because defendant did not knowingly and intelligently waive his *Miranda* rights; and (3) the evidence was insufficient to sustain the conviction of murder.

The child was born on September 6, 1975, at Harbor General Hospital. Dr. Wong testified that he examined the infant at about 8:30 a.m., on September 7, and again on the date of discharge, September 9 at 7:25 a.m.; he found no abnormalities. The weight at birth was seven pounds, one ounce, and on the day of discharge was six pounds, thirteen ounces, the decrease in weight being a normal loss within the first two or three days of life. The infant was pronounced dead in the emergency facilities of St. Mary's Medical Center in Long Beach on February 2, 1976.

Dr. Dykstra, a deputy coroner, performed an autopsy on February 3, 1976. He found that the remains weighed six pounds, that with respect to the child's organs there was no evidence of disease or congenital abnormality, and that the cause of death was a combination of malnutrition and dehydration due to starvation. A portion of Dr. Dykstra's testimony was: ". . . the complete lack of any fat stores and generalized muscle atrophy indicates there has been a prolonged chronic lack of food. And that this prolonged chronic lack of food has resulted in the depletion of the body stores of energy. And finally, the body simply has run out of energy and it stopped functioning."

Dr. Dykstra further testified as follows: "A. There was no evidence of any solid food in the entire gastrointestinal tract. . . . A. . . . The lack of any food in the intestinal tract, including stomach, small intestine and large intestine, indicates that the child had not had or been able to pass into its intestine solid food I would say certainly for the 16 hours prior to death. Probably for 24 hours. And quite likely for two to three days. Now, this is solid food that we're referring to. . . . Q. Doctor, if the child had been fed milk at 7:30 a.m. on the day of his death and had taken some of the milk in, and had died later at 12:10 p.m. that same day, would there have been evidence of that milk in the digestive tract? A. If the child had been given the milk and had retained the milk, yes. In other words had not vomited it or lost it from its stomach, then we should have evidence of milk curd either in the stomach or in the small intestine. With this period of time, actually, it probably would be in the

small intestine, rather than the stomach. As I've indicated here, there was no evidence of milk curd in the small intestine."

Dr. Jacobs, a pediatrician, testified that he concurred in Dr. Dykstra's opinion as to the cause of death.

Witnesses testified at the trial with respect to the care afforded the child by defendant and his wife during the infant's short (four days less than five months) period of life. For the most part, this testimony related to deficiencies in the feeding and care of the child observed by neighbors and friends, public health personnel and social workers in late 1975. At that time, the child did not appear to be getting enough to eat and his parents were advised to hold him during feeding and to add cereals and fruit to his diet.

Detective Wren of the Long Beach Police Department testified that he had two tape-recorded conversations with defendant, the first occurring on February 5, 1975, and the second on February 24, 1975. Defendant was arrested on the latter date.

At the beginning of the February 5 taped conversation, the officer stated to defendant his *Miranda* rights and asked defendant if he understood each of those rights. Defendant said that he did. The officer then asked: "Having these rights in mind do you want to talk to me now about this case?" and defendant answered, "Yes sir." In this first conversation, defendant stated that he had been separated from his wife for three months, that he only visited occasionally or weekends to see the children. Defendant acknowledged that the baby had been thin a month prior to his death but claimed "he had seemed to be getting heavier." Defendant also stated that he had personally fed the baby a jar of baby food and a bottle of milk the Friday night before the Monday that he died and denied knowing that his wife at times had failed to feed the baby all day long.

At the beginning of the February 24 taped conversation, the officer again stated to defendant his *Miranda* rights. The officer then asked defendant if he understood each of those rights. Defendant said that he did. The officer then asked: "Having these rights in mind do you want to talk to us now?" Defendant answered, "Yes, sir."

Early in the February 24 conversation, defendant was confronted with the fact that investigation disclosed the falsity of his claim that he was

living separate and apart from his wife. Defendant explained this deception as necessitated by the wife's having collected welfare on the basis that he had left her. Defendant admitted that he was aware that the baby wasn't getting enough to eat and stated that he had fed him himself at least every other night. When confronted with the inconsistency between this claim and the fact that the child had died of starvation and dehydration, defendant admitted that "for the last couple of weeks" he hadn't "fed him at all," and "made no effort whatsoever to see that he got anything to eat." Though at first he claimed to have seen his wife feed the child about three or four times during this period, he later conceded that during the last two weeks he never saw anyone feed the child.

During this taped conversation, defendant was questioned extensively concerning his understanding of what was happening to the child during the final two weeks of his life and his explanation for his conduct in respect of such circumstances. The taped conversation included the following questions and answers: "Q. You were aware that he wasn't getting enough to eat? A. Yes sir. . . . Q. You were aware that your wife was starving the kid wasn't feeding him enough? A. Yes sir. Q. But you did absolutely nothing about it? A. No sir. . . . Q. —you knew Linda [defendant's wife] wasn't feeding him right? A. Yes sir. . . . Q. But you knew he was starving to death didn't you? A. Yes sir. Q. And you didn't really care did you? A. I don't guess so. . . . Q. Okay we're not playing crossword puzzle. What we're playing is that you knew the kid was starving to death right? A. Yes sir. Q. And you did absolutely nothing about it? A. Yes sir. Q. Now, why didn't you do anything about it? A. Uh, I gue [*sic*] I, I, I just didn't care. . . . Q. You didn't care if Mikey lived or died? A. No. . . . Q. Why didn't you care whether he lived or died? A. I don't know, I ca— Q. Did you ever care from the day he was born whether or not he was your son and stayed alive? A. Yes. Q. When did you stop caring about him then? A. It, I, uh, it was after he was born."

Defendant testified in his own behalf. He was 27 years old. Usually his wife would feed the baby by fixing him a bottle, sometimes containing just plain milk. Sometimes she would mix a jar of baby food in the milk and take the bottle and "prop it up for him in the crib." She did not make it a habit to hold the child. When defendant fed the baby, he would usually hold him and feed him baby food or cereal with a spoon. Then he would give him a four-ounce bottle of milk. He requested his wife to take the baby to a doctor on more than one occasion, mostly in December and January. Defendant was working. When he would

attempt to do anything with the baby, his wife would usually get mad and an argument would ensue.

Defendant realized "that if you did not feed a child, the child would die," but he "couldn't stand the arguing constantly." He "[j]ust felt rejected, and I guess in a way I just give up, I couldn't stand arguing any more." However, he continued to live at home with his wife and children throughout the month of January and up to the date of the child's death. He threatened to leave but didn't do so, "[b]ecause I love my wife and kids." In his direct examination defendant also testified that on the date of the baby's death he had fixed a bottle for him and had put it in the crib about 7:30 in the morning. He also admitted that he had told police sergeant Dunyon that he "had been faithfully feeding the child" in the course of the February 5 interrogation.

Defendant further testified that his wife Linda was retarded. He did not know that she had been in several mental institutions. He relied on her to take care of the children. He further testified that he was hurt when the infant died because he "really loved" his child.

On cross-examination, defendant was obliged to admit that he had lied to Sergeant Dunyon when he denied that he was living in the same house with his wife and children. When asked to explain why he had not taken the baby to a doctor in January, though aware that he "was extremely thin," defendant referred to the "arguments every time I go around the two children or try to do anything," and to the fact that the "medical records and everything was listed under her name" and he "wasn't supposed to even really be there." However, defendant admitted "he could have taken him to the doctor if [he] had really wanted to."

On cross-examination defendant also qualified his testimony concerning giving the baby a bottle the morning of his death. He testified in this respect: "Q. And did you feed him a bottle? A. I fixed him a bottle and took it in to him. Q. What did you do with it? A. Propped it up on a little prop that we had made to hold the bottle for him. Q. Had anyone ever told you not to do that, not to prop a bottle for a five-month-old baby? A. We had been told that it wasn't the best way."

Dr. Coburn, a psychiatrist, testified that defendant's wife showed evidence of mental retardation and was incapable of caring for her children in an organized or sustained fashion.

We turn first to the contention that the trial court abused its discretion in admitting in evidence postdeath colored photographs of the infant. The governing law was recently expressed by our Supreme Court in *People v. Steger,* 16 Cal.3d 539, at pages 552-553 [128 Cal.Rptr. 161, 546 P.2d 665], as follows: "The test for determining whether photographs may be shown to the jury is not whether they are necessary, but whether their probative value outweighs their possible prejudicial effect. [Citation.]"

Part of defendant's argument is as follows: "The photographs contained discoloration, resulting from the flow of blood to the lowest part of the body following death. (Rep. Tr. at 210.) There were other markings on the corpse caused by the intravenous injections and 'cut downs' performed by Dr. Curry, a physician in the emergency room of the hospital. (Rep. Tr. at 171.)"

The record shows, however, that under cross-examination by defendant's counsel the autopsy surgeon explained the discolorations. Thus, Dr. Dykstra testified: "Q. BY MR. SIMPSON [defendant's attorney]: Now, doctor, directing your attention to a photograph that has been marked People's 4, which shows the backside of the child, could you explain what the discolorations on the backside of the child are? (Witness examines exhibit.) A. In the central portion of the upper back and in the central portion of the buttocks, the skin appears to be relatively white and pale, while around these areas it tends to be more of a pink/orange. This is the result of the fact that the child has been lying on his back following death. And in the area where the body weight contacts the surface of the table, it squeezes the blood out of the tissues and, therefore, it is diverted to one side or another. And that's the reason for this color. In other words, it's a postmortem artifact or something that occurs after death, and does not have clinical significance. It has no relationship to the body during the time of life. . . . A. . . . . That is lividity. After death, the blood tends to follow gravity and drops to the most dependent portion of the body."

Dr. Curry, the emergency physician at St. Mary's Medical Center, testified that he made a "cut down on the child," which was a simple surgical procedure in which a small incision is made "in front of where the elbow would be." On cross-examination by defendant's counsel, Dr. Curry testified that there was no cutting on the body except that puncture wound.

Thus the jury was informed of extraneous matters that were to be disregarded in observing the photographs.

It is true that the medical testimony described in plenary manner the condition and appearance of the infant at the time of its death. A situation of a kindred nature was presented in *State v. Bischert,* 131 Mont. 152 [308 P.2d 969], a manslaughter prosecution for the death of a six-months old baby due to starvation. In that case the trial court admitted in evidence three black and white photographs of the body of the infant and a colored slide taken after the postmortem. The colored slide was shown to the jury in the darkened courtroom by the use of a projector and screen. In reversing the judgment of conviction of involuntary manslaughter, the court stated (308 P.2d at p. 973): "The charge here was failure to provide food. It should be pointed out that there was no charge of failure to provide medical care. That the photographs excite sympathy for the child and indignation and prejudice against the appellant is easily understandable. They show ghastly and gruesome looking sores or scars alleged to have been caused by dermatitis burns which in no way go to proof of starvation. When the purpose of an exhibit is to inflame the minds of the jury or excite the feelings rather than to enlighten the jury as to any fact, it should be excluded. [Citations.] . . . [¶] Here, where the pathologist was fully able to explain his findings without the use of the photographs, their purpose could only arouse the human feelings of the jury without aiding them in further understanding of the crime charged. This constituted error."

We have examined the challenged photographs in the present case. As has been noted, the matters depicted which were extraneous to the charge were pointed out to the jury and, unlike the situation in the Montana case, were of such a character as not in themselves to be inflammatory. Insofar as the photographs showed the state of extreme emaciation of the victim, they were, to say the least, distressing. Their probative value, however, far outweighed any prejudicial effect. The real issue in the case was whether defendant actually understood that the child was literally "starving to death" in the terminal two weeks of his life. Defendant had made an admission that the jury could legitimately so construe and no amount of medical testimony describing the cause of death could effectively show the jury what was shown by the exhibits; that is, the condition of the child as perceived by defendant.

"The admission of such photographs, of course, lies solely within the discretion of the trial judge (*People v. Robles* (1970) 2 Cal.3d 205, 214 [85

Cal.Rptr. 166, 466 P.2d 710]; *People* v. *Sanchez* (1967) 65 Cal.2d 814, 828 [56 Cal.Rptr. 648, 423 P.2d 800]) and his ruling will not be reversed unless their probative value is clearly outweighed by their prejudicial effect (see, e.g., *People* v. *Love* (1960) 53 Cal.2d 843, 854-858 [3 Cal.Rptr. 665, 350 P.2d 705])." (*People* v. *Murphy,* 8 Cal.3d 349, 363 [105 Cal.Rptr. 138, 503 P.2d 594].)

In *Murphy,* the three photographs (two black and white and one in color) received in evidence showed the victim (1) "clad in a blood-stained dress" with "dried blood covering most of her face and neck region"; (2) "nude [with] two circled stab wounds . . . visible in the lower back region"; and (3) "clad in a blood-stained dress the bottom of which has been pulled up to expose two stab wounds in her stomach area [with] dried blood covering most of her face and neck region" and a "stab wound . . . visible in her neck." (*Id.* at p. 364.) The *Murphy* court described the photographs held properly admissible in *Love, supra,* 53 Cal.2d at page 852, as showing the victim's nude body on a hospital table with "a hole about 4 inches in diameter in her back and a large amount of blood on her back, the table and the hands of the person holding her body." (8 Cal.3d at p. 364.)

In ruling that the admission of the three photographs was not error, the *Murphy* court said (*id.* at p. 365): "Although the photographs in this case might be characterized as bloody and gruesome they were relevant to the issues and unlike those in prior cases the admission of which necessitated reversal. (See *People* v. *Cavanaugh* (1955) 44 Cal.2d 252, 267-268 [282 P.2d 53].) The trial court did not abuse its discretion in receiving the exhibits."

■ With respect to the tape-recorded conversation of February 24, 1976, defendant argues that his waiver of *Miranda* rights was not made knowingly and intelligently. Reference is made to the fact that his wife had been arrested, which caused him to be shocked, to the matter of his lack of sleep on the nights before the interview, and to his asserted extreme nervousness at the time of the interview. The testimony as to those matters, however, was given subsequent to the time when evidence of the tape-recorded conversation was introduced without objection.

It is to be noted that prior to the playing of the tape-recorded conversation, a portion of the recross-examination of Detective Wren by defendant's counsel was as follows: "Q. Now, could you describe his demeanor during the conversation we're going to hear? A. Yes. Q. All

right. Did he appear nervous? A. No. Q. He was very calm? A. Yes. Q. Did he appear sorrowful? A. At times. Q. Did he appear to feel badly about what had happened? A. At times. Q. How long did this conversation last, approximately? A. This conversation lasted from 9:13 a.m. to 9:41 a.m."

The record does not disclose any substantial basis for a determination that defendant's waiver of his *Miranda* rights was not knowingly, intelligently and voluntarily made. ■ Furthermore, since no objection on *Miranda* grounds was made to the introduction of the taped conversation at the trial, no claim of *Miranda* error may be raised on this appeal. (*In re Dennis M.,* 70 Cal.2d 444, 462 [75 Cal.Rptr. 1, 450 P.2d 296]; *People* v. *Brown,* 10 Cal.App.3d 169, 176-177 [88 Cal.Rptr. 801].)

■ The contention of defendant which remains for consideration is that there was insufficient evidence to sustain the conviction of murder of the second degree. Defendant argues that the "thrust of the conduct of the appellant was in actuality an omission to perform the legal duty that he owed toward his son, and not an affirmative act of killing." In essence, defendant's position is that there was not sufficient evidence of malice to justify a murder conviction and that, at most, the conviction could properly be for manslaughter because of failure to perform a duty owed to the infant.[1]

The question whether defendant's conduct constituted second degree murder or manslaughter was submitted to the jury upon proper instructions to which defendant takes no exception. First, the jury was instructed "that the word 'act' as used in these instructions includes an omission or failure to act in those situations where a person is under a legal duty to act," and that "the parent of a minor child has a duty to furnish necessary clothing, food, shelter and medical attention for his minor child." In addition, at the People's request, the court gave CALJIC instructions No. 8.10 (defining murder as the unlawful killing of a human being with malice aforethought); No. 8.11 (1974 rev.) (defining implied malice as doing "an act involving a high degree of probability that it will result in death, which act is done for a base, antisocial purpose and with a wanton disregard for human life by which is meant an awareness of a duty imposed by law not to commit such acts followed by

---

[1]Penal Code section 270 is in part as follows: "If a parent of a minor child wilfully omits, without lawful excuse, to furnish necessary clothing, food, shelter or medical attendance, or other remedial care for his or her child, he or she is guilty of a misdemeanor...."

the commission of the forbidden act despite that awareness"), and CALJIC No. 8.31 (1974 rev.) (defining second degree murder as follows):

"Murder of the second degree is the unlawful killing of a human being as the direct causal result of an act involving a high degree of probability that it will result in death, which act is done for a base, antisocial purpose and with wanton disregard for human life by which is meant an awareness of a duty imposed by law not to commit such acts followed by the commission of the forbidden act despite that awareness.

"When the killing is the direct result of such an act, it is not necessary to establish that the defendant intended that his act would result in the death of a human being."

The manslaughter instructions included CALJIC No. 8.37 (defining manslaughter as the "unlawful killing of a human being without malice aforethought") and a revised form of CALJIC No. 8.45 (1972 rev.). A portion of the latter instruction requested by the People dealt with the commission of acts "ordinarily lawful." A second portion, requested by defendant, read as follows:

"You are instructed that there is a legal duty of care between a parent and a child.

"A crime may result from an omission or failure to perform the legal duty of care. Death caused by a negligent omission or failure to perform the legal duty of care is involuntary manslaughter.

"The negligence must be aggravated, culpable, gross, or reckless, that is, the conduct of the accused must be such a departure from what would be the conduct of an ordinarily prudent or careful man under the same circumstances as to be incompatible with a proper regard for human life, or, in other words, a disregard of human life or an indifference to its consequences."

The question thus posed to the jury was whether defendant's omission to provide food for his child was "aggravated, culpable, gross, or reckless" neglect "incompatible with a proper regard for human life" (involuntary manslaughter) or involved such a high degree of probability that it would result in death that it constituted "a wanton disregard for human life" making it second degree murder.

■ These instructions correctly stated the law. The omission of a duty is in law the equivalent of an act and when death results, the standard for determination of the degree of homicide is identical. In *Biddle* v. *Commonwealth* (1965) 206 Va. 14 [141 S.E.2d 710] the Supreme Court of Appeals of Virginia collected the authorities and stated the rule as follows (*id.* at pp. 714-715):

"The precise question presented here seems never to have been decided by this Court. The general rule, supported by numerous authorities in England and the United States, is that *if death is the direct consequence of the malicious omission of the performance of a duty, such as of a mother to feed her child, this is a case of murder*; but if the omission is not wilful, and arose out of neglect only, it is manslaughter. Regina v. Hughes, 7 Cox C.C. 301, 302; Commonwealth v. Hall, 322 Mass. 523, 78 N.E.2d 644, 647; Lewis v. State, 72 Ga. 164, 53 Am.Rep. 835; Williams v. State, 88 Ga.App. 761, 77 S.E.2d 770; Pallis v. State, 123 Ala. 12, 26 So. 339, 82 Am.St.Rep. 106; State v. Bischert, 131 Mont. 152, 308 P.2d 969, 972; State v. Shephard, 255 Iowa 1218, 124 N.W.2d 712, 721 (Iowa, Nov. 12, 1963, reh. den. Jan. 14, 1964); Gibson v. Commonwealth, 106 Ky. 360, 50 S.W. 532, 90 Am.St.Rep. 230. See Annotation in 61 L.R.A. 290; also 1 Wharton's Criminal Law, 12th ed., § 485, p. 715; 1 Wharton's Criminal Law & Practice (Anderson), § 297, p. 623; 26 Am.Jur., Homicide, § 207, pp. 295, 296; 40 C.J.S. Homicide § 20, p. 867.

"In Commonwealth v. Hall, supra, the defendant was convicted of murder in the second degree. A jury found that a two-month-old baby died of starvation and dehydration resulting from the intentional conduct of the defendant in placing it in an attic and withholding food and liquids from it.

"In Lewis v. State, supra, a five-year-old child came to his death from the want of proper food, exposure to inclement weather, and physical abuse that he had received, and the defendant was found guilty of murder and sentenced to life imprisonment.

"In State v. Bischert, supra, the defendant was charged with the manslaughter of his 5½-month-old baby by neglecting and refusing to provide the necessary food to sustain the child's life. Although the conviction was reversed because of the introduction of prejudicial photographs, the court held that a failure to provide the necessities of life to one whom is owed a duty is a sufficient basis on which to predicate and sustain a conviction for a negligent homicide, that is involuntary manslaughter.

"In Pallis v. State, supra, the defendant was convicted of an assault with intent to murder, and the court quoted Mr. Bishop on Criminal Law as follows: 'If the exposure or neglect of an infant or other dependent person, resulting in death, is an act of mere carelessness, wherein the danger to life does not clearly appear, the homicide is only manslaughter; whereas, if the exposure or neglect is of a dangerous kind, it is murder. For example, *if from an infant of tender years the person under obligation to provide for it wilfully withholds needful food or any other needful thing, though not with intent to kill, and by reason thereof the child dies, he commits murder.'* 2 Bish.New Cr.Law, § 686.

"Thus, from the authorities heretofore quoted, whether the defendant was guilty of manslaughter or murder depends upon the nature and character of the act or acts which resulted in the child's death." (Italics added.)

More recently, in *Albright* v. *State* (1973) 291 Ala. 801 [280 So.2d 186, 190], the Supreme Court of Alabama stated the same view, as follows:

"The several counts of this indictment embodies charges of 'commission', and 'omission'. The law of neglect or omission as the same relates to infant children comes to us from the ancient common law being grounded upon a status relationship of paternal support, care, protection and nurture. An obligation imposed by law carries with it the corresponding legal duty to meet and discharge the responsibility. *Willfully allowing one to be exposed to conditions which will probably result in death, where there is a duty to protect such person, constitutes murder.* To create criminal responsibility for death resulting from exposure, there must be neglect to perform a legal or contractual duty which accused was bound to perform. State v. Berry, 36 N.M. 318, 14 P.2d 434.

"The rule is stated in 29 C.J. on pages 1096 and 1097 as follows: '*The omission or neglect to perform a duty resulting in death may constitute murder where the omission was willful* and there was deliberate intent to cause death, *or where the omission must necessarily lead to death,* so willfully allowing one to be exposed to conditions which *will probably result in death, where there is a duty to protect such person, constitutes murder.*' (emphasis added).

"Mr. Bishop, in discussing the subject, says: 'If the act is one of negligence not clearly showing danger of life, yet, if death follows, the offense is only manslaughter; whereas, if the exposure or neglect is of a dangerous kind, it is murder. Ordinarily, if a husband should withhold

necessaries from his wife and she dies, it will be only manslaughter, since this act is not so immediately dangerous to life as the other. Whether death caused by neglect is murder or manslaughter is made to depend on the nature and character of the neglect.'

"One who intentionally withholds food and liquids from a baby, so that it dies, or willfully exposes a helpless infant to freezing cold weather whereby it freezes to death, is guilty at common law of murder, and if the omission arises from negligence only it is a case of manslaughter.

"In Regina v. Hughes, 7 Cox C.C. 301, page 302, Lord Campbell, C. J., said, 'But it has never been doubted that if death is the directed consequence of the malicious omission of the performance of a duty (as of a mother to nourish her infant child) this is a case of murder. If the omission was not malicious and arose from negligence only, it is a case of manslaughter.'

"This statement is supported by numerous authorities in England and the United States, Regina v. Bubb, 4 Cox C.C. 457; Regina v. Conde, 10 Cox C.C. 547, 549; Regina v. Handley, 13 Cox C.C. 79; Rex C. Gibbins, 13 Cr.App.Rep. 134; Lewis v. State, 72 Ga. 164, 53 Am.Rep. 835; State v. Barnes, 141 Tenn. 469, 212 S.W. 100; Gibson v. Commonwealth, 106 Ky. 360, 50 S.W. 532 90 Am.St.Rep. 230; Pallis v. State, supra; Bishop on Criminal Law, 9th Ed. Sec. 686; Wharton's Criminal Law, 12th Ed. Sec. 485." (Italics added.)

Thorough research reveals no contrary cases. We, therefore, conclude that the common law does not distinguish between homicide by act and homicide by omission. The common law rule was recognized by this court in *People* v. *Montecino,* 66 Cal.App.2d 85 [152 P.2d 5], in which a conviction of involuntary manslaughter was affirmed. The victim, an aged and infirm woman confined to bed, died as a result of the defendant's neglect of her care, which she had contracted to provide. In affirming the judgment, the court said (*id.* at pp. 100-101): ". . . It can hardly be questioned, in the instant case, that the defendant was under a legal duty imposed by contract to care for Mrs. Mata and, in our opinion, the court was justified in finding that in the performance of that duty she failed so egregiously as to be responsible for the death of her patient. Section 484, Wharton's Criminal Law (12th ed.), volume 1, page 714, carries the caption: 'Killing helpless person by neglect is manslaughter.' The author then says, 'The doing an act, or the imperfect performance of a duty, toward a person who is helpless, which naturally and ordinarily leads to the death of such person, is murder, if death or grievous bodily

harm is intended; and manslaughter, if the cause is negligence [footnote cases].' In certain jurisdictions, it appears from 29 Corpus Juris, *supra,* 1158, that 'A charge of manslaughter may be predicated upon a failure to act as well as upon an act. *Willful failure of a person to perform a legal duty, whereby the death of another is caused, is murder,* but if the omission was not willful, but was the result of gross or culpable negligence, it is involuntary manslaughter.' . . ." (Italics added.)

The doctrine of implied malice is well-established in this state. It was most recently stated by our Supreme Court in *People* v. *Poddar,* 10 Cal.3d 750 [111 Cal.Rptr. 910, 518 P.2d 342]. The trial court had given CALJIC No. 8.31 substantially in the form employed in the case at bench. In holding that the instruction was not erroneous, the court said (*id.* at pp. 756-757): "The language of 8.31 reflects the statutory standard of implied malice set out in Penal Code section 188: '[Malice] . . . is implied . . . when the circumstances attending the killing show an abandoned and malignant heart.' The phrase 'abandoned and malignant heart' has been construed to be that state of mind '[w]here the defendant for a base, antisocial purpose, does an act which involves a high degree of probability that it will result in death' (*People* v. *Thomas* (1953) 41 Cal.2d 470 [261 P.2d 1], Traynor, J. concurring) with wanton disregard for human life (*People* v. *Washington, supra,* 62 Cal.2d at p. 782 [44 Cal.Rptr. 442, 402 P.2d 130]). When this state of mind has been specifically found to exist then defendant has acted with malice." (See also *People* v. *Atkins,* 53 Cal.App.3d 348, 359 [125 Cal.Rptr. 855].)

█ The only question remaining is whether there was substantial evidence to support the jury's implied finding that defendant's conduct was such as to show an "abandoned and malignant heart" by omitting "for a base, antisocial purpose" the performance of a duty involving "a high degree of probability that it will result in death." █ In deciding this question, we are governed by the rule stated by our Supreme Court in *People* v. *Kunkin,* 9 Cal.3d 245, 250 [107 Cal.Rptr. 184, 507 P.2d 1392, 57 A.L.R.3d 1199]: "In *People* v. *Mosher* (1969) 1 Cal.3d 379, 395 [82 Cal.Rptr. 379, 461 P.2d 659], we observed that 'this court must view the evidence in a light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. . . . If the circumstances reasonably justify the trial court's findings, an appellate court cannot reverse merely because the circumstances might also be reasonably reconciled with a contrary finding. . . . The test on appeal becomes whether substantial evidence supports the conclusion of the trier of fact, not whether the evidence proves guilt beyond a reasonable doubt.'

"In *People* v. *Reilly* (1970) 3 Cal.3d 421, 425 [90 Cal.Rptr. 417, 475 P.2d 649], we emphasized that reasonableness was the ultimate standard under the substantial evidence rule. 'The appellate court must determine whether a reasonable trier of fact could have found the prosecution sustained its burden of proving the defendant guilty beyond a reasonable doubt.' When unsubstantial circumstantial evidence is urged in support of an inference of guilty knowledge, we have not hesitated to find that evidence insufficient. (See *People* v. *Williams* (1971) 5 Cal.3d 211, 215-217 [95 Cal.Rptr. 530, 485 P.2d 1146].) ██ 'Evidence which merely raises a strong suspicion of the defendant's guilt is not sufficient to support a conviction. Suspicion is not evidence, it merely raises a possibility, and this is not a sufficient basis for an inference of fact.' (*People* v. *Redmond* (1969) 71 Cal.2d 745, 755 [79 Cal.Rptr. 529, 457 P.2d 321].) The substantial evidence rule mandates consideration of the weight of the evidence before deferring to the conclusions drawn from the evidence by the trier of fact. '[I]n determining whether the record is sufficient . . . the appellate court can give credit only to "substantial" evidence, i.e., evidence that reasonably inspires confidence and is "of solid value." ' (*People* v. *Bassett* (1968) 69 Cal.2d 122, 139 [70 Cal.Rptr. 193, 443 P.2d 777].)"

██ Applying this standard, we have no doubt that there was substantial evidence supporting the jury's finding. In the taped conversation of February 24, defendant admitted that he was aware, during the last two weeks of the victim's life, that he was literally "starving to death." Though in some contexts that language might have the innocuous colloquial meaning that he was ravenously hungry, it was for the jury, and not for this court, to decide which meaning was intended by this admission. Considered in the context of all the evidence, the admission clearly was susceptible of the interpretation placed upon it by the jury. Defendant was obliged to concede that for the last two weeks of the victim's life he could not remember his "getting anything to eat ever." The color photographs of the victim's body were themselves sufficient to show that defendant must have appreciated that his baby was in a state of terminal starvation. Add to this defendant's statement that he did nothing about the child's deplorable state, though he could have if he "had really wanted to," because he "just didn't care," and the substantiality of the evidence to support the jury's finding "wanton disregard for human life" is manifest.

A defendant's lack of concern as to whether the victim lived or died, expressed or implied, has been found to be substantial evidence of an "abandoned and malignant heart" by the appellate courts of this state. In

*People* v. *Jones,* 215 Cal.App.2d 341 [30 Cal.Rptr. 280], the defendant was convicted of second degree murder. The testimony of an officer was to the effect that defendant stated the reason he was kicking the victim after he had shot him was "because I didn't care whether he died or not." (*Id.* at p. 345.) This was held to be evidence of an abandoned and malignant heart, justifying the conviction of second degree murder.

In *People* v. *McCartney,* 222 Cal.App.2d 461 [35 Cal.Rptr. 256], a second degree murder conviction was reversed for failure to give an instruction on manslaughter. However, the court found that the evidence was sufficient to support a finding of malice. In this respect, the court said (*id.* at p. 469): "In addition, the jury could have reasonably concluded that defendant acted with an '*abandoned and malignant heart.*' A dangerous weapon was used. An officer testified he heard defendant say she was glad she shot the deceased. In addition after the shooting, defendant made no effort to render medical aid. 'In determining whether defendant's acts disclosed an abandoned and malignant heart, thus establishing implied malice, the jury was entitled also to consider defendant's conduct following the fatal injury. [Citations.] *Defendant's failure to seek . . . medical aid even though he knew that his wife was seriously injured indicates a heartless attitude and callous indifference toward her.*' (*People* v. *Ogg, supra,* 159 Cal.App.2d 38, 51 [323 P.2d 117].)" (Italics added.)

The jury was entitled to disbelieve defendant's claim that he was prevented from effectively caring for his baby by his wife's objections to any interference. Defendant's credibility was thoroughly impeached by his admission that he had lied to the officers about his living with his wife and children and by the autopsy surgeon's testimony that there was no food in the child's alimentary canal, which was unlikely if defendant had fed the baby on the morning of its death as he testified. When all of the above circumstances are combined, we cannot state that there was a lack of substantial evidence to support the jury's finding of malice. The verdict of guilty of second degree murder must stand.

The judgment is affirmed.

Allport, J., concurred.

FORD, P. J.—I dissent. I believe that while the evidence was sufficient to sustain a conviction of involuntary manslaughter, it was insufficient to warrant a verdict of murder of the second degree.

The majority opinion lays stress upon the last two weeks of the baby's life and thereby gives the false impression that the issue of malice was to be determined by events occurring in that period of time, whereas the record shows that the malnutrition existed from the time the infant left the hospital shortly after birth until his death almost five months later. As will be explained, the evidence showed gross negligence but not malice.

Dr. Hurd, who examined the infant at the Child Health Center in Long Beach on October 4, 1975—about a month after the infant's birth—testified that the child then weighed six pounds, ten ounces, which was three ounces less than his weight at the time he left the hospital on September 9, 1975. Dr. Hurd further testified as follows: "A. Well, it was obvious the child was either not receiving or not assimilating the proper amount of food. Q. . . . Did you give some instructions to the parents about feeding him at that time? A. Yes, I did. Particularly in regard to not only in regard [sic] to the use of cereal, which often is retained when formula may not be, but also in regard to the positions of feeding. I always give infants that have had a report of difficulty in feeding instructions in regard to positions of the infant."

The prosecution's case as to the existence of malice appears to have rested mainly on the interrogation of defendant by Sergeant Dunyon and Detective Wren on February 24, 1976, portions of which are noted in the majority opinion. While defendant's statements showed that he and his wife grossly neglected the child and that he admitted that he was at fault in so doing, they did not afford a substantial basis for a determination that he harbored malice toward the child during the period of neglect.[1]

---

[1]The distinction between a factual situation constituting murder and one constituting involuntary manslaughter is well expressed in the opinion in *Commonwealth* v. *Hall*, 322 Mass. 523 [78 N.E.2d 644], wherein a mother placed her child in an attic and withheld food and liquids from it. The Massachusetts high court, in upholding a conviction of second degree murder, stated (78 N.E.2d at p. 647): "The jury could have found on the foregoing evidence that the baby died of starvation and dehydration resulting from the intentional conduct of the defendant in placing it in the attic and withholding food and liquids from it. While the precise question seems never to have been decided in this Commonwealth, we have no doubt that such conduct in the circumstances obtaining here would constitute murder at common law. [Fn. omitted.] In Regina v. Hughes, 7 Cox C.C. 301, page 302, Lord Campbell, C. J., said, 'But it has never been doubted that if death is the directed [sic] consequence of the malicious omission of the performance of a duty (as of a mother to nourish her infant child) this is a case of murder. If the omission was not malicious and arose from negligence only, it is a case of manslaughter.' This statement is supported by numerous authorities in England and in the United States. Regina v. Bubb, 4 Cox C.C. 455; Regina v. Conde, 10 Cox C.C. 547, 549; Regina v. Handley, 13 Cox C.C. 79; Rex v. Gibbins (1918) 13 Cr.App.Rep. 134; Lewis v. State, 72 Ga. 164, 53 Am.Rep. 835; State v. Barnes, 141 Tenn. 469, 212 S.W. 100; Gibson v.

(See *People* v. *Montecino,* 66 Cal.App.2d 85, 100-101 [152 P.2d 5]; cf. *Eaglen* v. *State,* 249 Ind. 144 [231 N.E.2d 147, 150-151]; *State* v. *Staples,* 126 Minn. 396 [148 N.W. 283]; *State* v. *Bischert,* 131 Mont. 152 [308 P.2d 969, 972]; *State* v. *Mason,* 18 N.C.App. 433 [197 S.E.2d 79]; *Biddle* v. *Commonwealth,* 206 Va. 14 [141 S.E.2d 710, 714-715].)

The test for determining the sufficiency of evidence—in the present case, the sufficiency of the evidence as to malice—is set forth in *People* v. *Bassett,* 69 Cal.2d 122, at page 139 [70 Cal.Rptr. 193, 443 P.2d 777]: "In resolving that contention the appellate court is required to determine whether a reasonable trier of fact could have found that the prosecution sustained its burden of proving the defendant guilty beyond a reasonable doubt. [Citation.] The prosecution's burden is a heavy one: 'To justify a criminal conviction, the trier of fact must be reasonably persuaded to a near certainty. The trier must therefore have reasonably rejected all that undermines confidence.' [Citation.] Accordingly, in determining whether the record is sufficient in this respect the appellate court can give credit only to 'substantial' evidence, i.e., evidence that reasonably inspires confidence and is 'of solid value' . . . ."

While there is no substantial evidence of malice to sustain a conviction of murder of the second degree, a new trial is not required. Since there is overwhelming evidence that defendant was guilty of involuntary manslaughter, the provisions of Penal Code section 1260 are applicable. (*People* v. *Steger,* 16 Cal.3d 539, 553 [128 Cal.Rptr. 161, 546 P.2d 665].) I would modify the judgment by reducing the offense to that of involuntary manslaughter (Pen. Code, § 192, subd. 2), affirm the judgment as so modified, and remand the case to the trial court for probation and sentence hearing in light of such modification of the judgment.

A petition for a rehearing was denied September 7, 1977, and appellant's petition for a hearing by the Supreme Court was denied October 6, 1977. Bird, C. J., and Tobriner, J., were of the opinion that the petition should be granted.

Commonwealth, 106 Ky. 360, 50 S.W. 532, 90 Am.St.Rep. 230; Pallis v. State, 123 Ala. 12, 26 So. 339, 82 Am.St.Rep. 106. See annotation in 61 L.R.A. 290. See also Bishop on Criminal Law, 9th Ed., § 686; Wharton's Criminal Law, 12th ed., § 485." (See Annot: Homicide by Withholding Food, Clothing, or Shelter, 61 A.L.R.3d 1207, 1217.)