91 Cal.Rptr.2d 563 (1999)
77 Cal.App.4th 368
The PEOPLE, Plaintiff and Respondent,
v.
Jackie Lynn ANDERSON, Defendant and Appellant.
No. G021627.
Court of Appeal, Fourth District, Division Three.
December 30, 1999.
As Modified on Denial of Rehearing January 20, 2000.
Review Denied April 12, 2000.[*]
*565 Cynthia M. Sorman, under appointment by the Court of Appeal, San Diego, for Defendant and Appellant.
Daniel E. Lungren and Bill Lockyer, Attorneys General, George Williamson and David P. Druliner, Chief Assistant Attorneys General, Gary W. Schons, Senior Assistant Attorney General, Janelle M. Boustany and John T. Swan, Deputy Attorneys General, for Plaintiff and Respondent.

*564 OPINION
SILLS, P.J.
Jackie Lynn Anderson was convicted of felony child abuse under conditions likely to produce great bodily harm and death (Pen.Code, § 273a),[1] and second degree murder (§ 187, subd. (a)) after two separate incidents, several years apart, in which she delivered a baby unassisted, then concealed the birth and failed to attend to the infant. The first such infant survived even though it was not discovered until some 32 hours after birth; the second died shortly after birth. Anderson raises five arguments on appeal: (1) The second degree murder conviction must be reversed because the prosecution failed to establish the corpus delicti or prove the existence of any criminal agency as the cause of death; (2) the second degree murder conviction must be reversed because there was insufficient evidence of malice; (3) the trial court erred in admitting statements Anderson made to the police prior to being advised of her Miranda[2] rights; (4) the trial court erred in denying Anderson's motion for entry of a judgment of acquittal at the conclusion of the prosecution's case pursuant to section 1118; and (5) the trial court erred in calculating Anderson's presentence custody credits under section 2933.1. We affirm her conviction *566 of felony child abuse, but agree the evidence presented was insufficient to support a finding of malice; accordingly, we reduce Anderson's conviction from second degree murder to involuntary manslaughter, and remand to the trial court for resentencing.

FACTS
When the '92 baby[3] was born, Anderson shared a house with a co-worker, Anna Grable. They were both alcoholics and drank heavily every day, beginning around noon at work and continuing into the night. They would go out to nightclubs on the weekends, and Anderson would have sexual relations with men she met. She did not use birth control during these encounters because "it wasn't something that I planned. I did not say, okay, tonight I'm going to go out and I'm going to meet somebody and we are going to sleep together." Anderson did not know who the father of the '92 baby was.
Anderson did not tell anyone she was pregnant. Grable noticed she was gaining weight but attributed it to their heavy drinking. Anderson delivered the baby alone, in her bed, very early on a Saturday morning. After the birth, she left the baby alone in the bed and went to sleep on the couch in the living room. Anderson believes she checked on the baby periodically over the weekend and possibly breastfed her but cannot be sure.
On Monday morning, Anderson dressed and left for work as usual. It was raining that day and after Grable's daughter went into Anderson's room in search of an umbrella, she called Grable. When Grable entered the room, she saw that it was "very bloody." Grable took her daughter to school and then returned and opened the door to the room. She heard a "horrible little whimpering sound" and left the room. Grable subsequently called the police.
The police discovered a newborn under approximately 20 to 30 items of clothing that had been piled on the bed. The infant was naked and was not moving. Its head was "kind of purplish in color" and it was cold to the touch. The umbilical cord was still attached and a film of afterbirth material partially covered the baby's face. The paramedics arrived a short time later and suctioned the baby's nose and mouth. They cut the umbilical cord, wrapped the baby and rushed it to the hospital.[4]
The police located Anderson at work. When asked if she had left something at home, she said, "Oh, the baby." She voluntarily accompanied the officers to the police station and spoke with the police after waiving her Miranda rights. She told the police she had planned to take the child to a hospital "later on." She said she left the baby in the bed because she was confused. She was arrested and booked, and then released on her own recognizance. The case was not prosecuted until she was arrested in connection with the death of the '95 infant.
Anderson was living with her mother, Peggy Anderson,[5] and her mother's companion, Jack Dillon, when the '95 baby was born. Anderson had quit her job and was living out of her car when Peggy convinced her to come live in her home. Shortly after Anderson moved in, Peggy became suspicious that she was pregnant again. Anderson at first denied she was pregnant, but admitted it when her mother finally "almost forced it out of her." Anderson believes she was about seven and one-half *567 months pregnant. When Peggy asked her what her plans were, Anderson said she had no plans. Dillon took Anderson to social services to try to arrange for MediCal and public assistance. After discussions with her mother, Anderson agreed to talk to social services about putting the baby up for adoption.
Social services told Anderson she had to provide proof she was unemployed and proof she was pregnant. She obtained proof of unemployment, and went for a pregnancy test, which was positive. When she took those papers in, social services told her there were other things she needed to do, such as establish ownership of her car, and have Dillon fill out some papers showing she was supposed to pay rent. Anderson made an appointment to return to social services a couple of days later.
That night, she went into labor. She went downstairs to her bedroom at about 10 p.m. and walked around until about midnight, when she could feel "[t]hat the baby was coming." She went into the bathroom and sat on the toilet, but closed the lid because she "didn't want the baby to fall in the toilet," and got a towel from under the sink. She "did a couple of ... a couple of hard pushes and the baby was out." She wrapped the baby in the towel and held it while she delivered the afterbirth. She cut the umbilical cord with scissors she had earlier brought down from upstairs, and flushed the afterbirth down the toilet. She said the baby did not cry. When the police asked if she checked to see if the baby was breathing, she said the breathing "sounded shallow. It just sounded not ... not normal to me." She did not clean the baby at all, or determine its sex. She ran a finger around the baby's mouth because it "looked like it had mucous and stuff like that." She put the baby on the bathroom floor while she got a blanket out of her room, and wrapped the baby in the blanket. She got another towel and cleaned up the bathroom. At about 1:30 or 2 a.m., she took the baby into her room and laid him on her bed. She went into the adjacent den and spent the rest of the night there.
At about 6 a.m., she went upstairs to the main part of the house and made coffee. She stayed home all that day, "waiting for a phone call." She spent most of the day in the den next to her bedroom, but left the baby lying on the bed. She went into the bedroom "a few times" and touched his chest with her hand, but "didn't feel anything. Didn't hear any breathing." That evening she left the baby on the bed while she went upstairs and ate dinner with her family. She then watched television and slept on the couch in the den.
The next morning, Anderson rose at six, made coffee and took a shower. While her mother was out on her morning walk and Dillon was asleep upstairs, Anderson went to the garage and got a cardboard box. She put the baby in the box and put it on the back seat of her car. She drove to social services, arriving about 9 a.m. She went inside and waited to see her social worker until about noon, and then left and went to Carl's Jr. for lunch. After she ate, she bought a beer at a mini-mart and drank it. She returned to social services but did not go in because she "didn't like sitting inside the building." She waited in her car, periodically going into the building and calling her social worker's extension. She left social services at about 4 p.m. without having seen her worker. During the time she waited in the car, she never checked on the baby. Just before she left social services, she moved the box containing the baby from the back seat into the trunk.
While Anderson was at social services, Peggy went down to her room to move some family items out of the closet to make room for Anderson's clothes. She found a trash bag in the closet and looked in it. She saw blood-soaked towels and clothes in the trash bag and became concerned.
*568 When Anderson arrived home at around 6 p.m., dinner was almost ready, and the family sat down and ate dinner together. Peggy reported they "had normal conversation." Peggy thought Anderson had been drinking because her eyes were "blurry" and she "was talking louder than normal." After dinner, Peggy went downstairs and confronted Anderson. She told her she had found the blood-soaked items and asked her if she was still pregnant. Anderson said she had been spotting and had gone to the doctor. She told her mother she was still pregnant. Peggy described the conversation as "[a] verbal argument."
Peggy went upstairs and said to Dillon, "She will not talk to me because she has been drinking." He did not believe Anderson had been drinking, but he suggested Peggy "go see if you can find any evidence in her car." In the course of searching the car, Peggy opened the trunk and saw the baby in the box. She knew immediately it was dead. She walked back to the house "in shock." She could not recall telling Dillon what she had found, but remembered he called 911. The police and paramedics responded.
Anderson told the police she knew her mother and Dillon were in the house when she gave birth, but she did not call for help because "I can't talk to my mom" and she could only talk to Dillon "a little bit." She thought about calling 911 but said she panicked. When asked why she panicked, she said, "I honestly don't know. I don't know why I panicked." When asked if she ever thought about "maybe calling for assistance with the baby or calling paramedics, 911," she replied she "thought about it all day, all night," but could not give a reason why she did not. She said she had not wanted to harm the baby.
An autopsy revealed the baby was born alive and was capable of living. He was born after 32 to 36 weeks' gestation (full term is 40 weeks). There was no food or fluid in his stomach and no urine in his bladder. The lungs were pink, indicating he had taken a breath. The coroner estimated he had taken at least 10 to 12 breaths before mucous blocked his upper respiratory passages and rendered him unable to breathe. Brain death would have occurred within 10 minutes after breathing ceased.
Four psychiatrists testified at trial. Dr. David Julian Scheffner, a court-appointed psychiatrist, attributed Anderson's "pathologically indifferent" behavior toward the babies to her alcoholism and to "irresponsibility" resulting from a "very substantial psychiatric and characterologic disturbance." Drs. Ernest William Klatte and Margaret G. Spinelli testified for the defense. Dr. Klatte diagnosed Anderson as a chronic alcoholic, and with a dissociative reaction, "a type of reaction in which the person tends to compartmentalize some part of their life and set it aside as if it's notnot in effect or not active." He did not believe her actions were consistent with a postpartum depression, nor did he believe Anderson was psychotic or suffered from psychotic symptoms. Dr. Spinelli testified that as a result of the precipitous drop in hormones associated with birth, many women experience psychotic symptoms and experience delivery as a traumatic event, resulting in "a kind of neonaticide dissociative syndrome." Dr. Kaushal Sharma testified for the prosecution. He agreed Anderson was an alcoholic but did not believe she was clinically depressed. He found no connection between any mental illness and "her actions of letting the baby die in the 1995 incident."
The trial court, sitting without a jury, found Anderson guilty of felony child abuse under conditions likely to produce great bodily harm and death ('92 baby), and second degree murder ('95 baby). It found implied malice because a parent has an affirmative duty to care for his or her child, and thus Anderson had "an immediate necessity to care for the child. And that failure to care for the child would involve a high degree of probability that *569 the result would be the death of the child." The trial court believed Anderson was aware of her duty to care for the '95 baby, and her failure to care for him in the face of a high probability that the failure would result in death "exhibited a wanton disregard for life." It sentenced her to 15 years to life for the murder of the '95 baby, and a concurrent sentence of 4 years for the felony child abuse of the '92 baby.

DISCUSSION

Corpus Delicti
Anderson first argues her conviction for second degree murder must be reversed because the prosecution failed to prove either the existence of any criminal agency as the cause of the '95 baby's death, or that any act or omission by Anderson was the proximate cause of his death. The Attorney General counters that Anderson waived any claim of violation of the corpus delicti rule by her failure to object on that ground at trial, and we must agree.
"`The corpus delicti of a crime consists of two elements, the fact of the injury or loss or harm, and the existence of a criminal agency as its cause.' [Citation.]" (People v. Jennings (1991) 53 Cal.3d 334, 364, 279 Cal.Rptr. 780, 807 P.2d 1009.) "Proof of the corpus delicti need not be beyond a reasonable doubt; a slight or prima facie showing is sufficient. [Citation.]" (People v. Diaz (1992) 3 Cal.4th 495, 529, 11 Cal.Rptr.2d 353, 834 P.2d 1171.) `"To meet the foundational test the prosecution need not eliminate all inferences tending to show [no crime was committed]. Rather, the foundation may be laid by the introduction of evidence which creates a reasonable inference [a crime was committed] even in the presence of an equally plausible noncriminal explanation of the event.' [Citation.]" (People v. Martinez (1994) 26 Cal.App.4th 1098, 1104, 31 Cal.Rptr.2d 869.)
It is well-settled that a defendant who fails to specifically object to the prosecution's failure to establish the corpus delicti at trial is precluded from raising the issue for the first time on appeal. In People v. Sally (1993) 12 Cal.App.4th 1621, 16 Cal.Rptr.2d 161, the court found the appellants'"failure ... to assert insufficiency of the evidence based on the corpus delicti rule to be fatal to defendants' positions. Because they failed to object on the ground of violation of the corpus delicti rule, defendants may not on appeal, and for the first time, rely on that rule in this case. [Citation.] A defendant cannot on review complain of insufficiency of evidence based on improper admission of corpus delicti evidence where defendant omitted to interpose a specific objection on the ground of the corpus delicti rule." (Id. at p. 1628, 16 Cal.Rptr.2d 161.) The rationale for this rule has been stated by our Supreme Court: "It may well be that `proof of the corpus delicti was available and at hand during the trial, but in the absence of [a] specific objection calling for such proof it was omitted.' [Citation.]" (People v. Wright (1990) 52 Cal.3d 367, 404, 276 Cal.Rptr. 731, 802 P.2d 221.)
Having failed to raise this issue at trial, Anderson cannot raise it for the first time on appeal.

Insufficient Evidence of Criminal Agency
Anderson also argues that there was insufficient evidence presented to establish the death was caused by a criminal agency. She contends there was no testimony that effective help could have been summoned within the one to two minutes the infant was breathing, and there was no showing Anderson was in a position to obtain effective medical assistance during that time period.
The same argument was raised in People v. Chavez (1947) 77 Cal.App.2d 621, 627, 176 P.2d 92. The young woman in that case gave birth alone, in the bathroom, after concealing her pregnancy from her family. (Id. at pp. 622-623, 176 P.2d 92.) The infant dropped into the toilet at birth, and the mother failed to attend to it *570 while delivering the afterbirth and caring for herself. (Ibid.) She then removed the baby from the toilet, cut the cord, and set the infant aside while she cleaned the bathroom. (Id. at p. 623, 176 P.2d 92.) She wrapped the baby in newspaper and left it concealed under the bathtub so her family would not discover the birth. (Ibid.) The coroner was able to establish that the baby was born alive, but could not conclusively establish the cause of death. (Id. at pp. 624, 627, 628, 176 P.2d 92.)
That court defined involuntary manslaughter "as the unlawful killing of a human being `in the commission of a lawful act which might produce death ... without due caution and circumspection.' The failure to use due care in the treatment of another where a duty to furnish such care exists is sufficient to constitute that form of manslaughter which results from an act of omission. [Citation.]" (People v. Chavez, supra, 77 Cal.App.2d at p. 628, 176 P.2d 92.) It found the evidence "indicates a complete failure on the part of the appellant to use any of the care towards this infant which was necessary for its welfare and which was naturally required of her." (Ibid.) She was not incapacitated because she was capable of tending to her needs and cleaning up the bathroom, demonstrating "she had a full realization of the situation" and "was able to think clearly and act with definite ends in view." (Ibid.) "With plenty of assistance near at hand she intentionally chose not to call for any help." (Id. at pp. 628-629, 176 P.2d 92.) The court concluded the evidence was "entirely sufficient to show that the death of this infant was caused by a criminal act." (Id. at p. 629,176 P.2d 92.)
The facts of this case are very similar to those in Chavez. The coroner established the baby was born alive, was capable of living, had taken at least 10 to 12 breaths before mucous clogged his airways, and died approximately 10 minutes after breathing ceased.[6] During that period of time, Anderson delivered the afterbirth, cut the cord, wrapped the baby, and began to clean up the bathroom. These actions indicate she was aware of her surroundings and was physically capable of moving about and performing tasks. As in Chavez, help was nearby; Peggy and Dillon were upstairs, and a telephone was readily available. Despite her duty to attend to her newborn infant, and her ability to attend to the baby, Anderson did nothing other than swipe a finger around his mouth and wrap him in a towel before setting him aside. The baby then died *571 because he was unable to breathe due to the mucous clogging his upper airway.
Concealing a pregnancy and giving birth alone at home are not acts which in and of themselves give rise to criminal liability. But giving birth without assistance is a lawful act which might produce death if not undertaken with due caution and circumspection. (People v. Chavez, supra, 77 Cal.App.2d at p. 628, 176 P.2d 92.) "`[T]he parent of a minor child has a duty to furnish necessary clothing, food, shelter and medical attention for his [or her] minor child.'" (People v. Burden (1977) 72 Cal.App.3d 603, 614, 140 Cal. Rptr. 282; see also People v. Heitzman (1994) 9 Cal.4th 189, 198, 37 Cal.Rptr.2d 236, 886 P.2d 1229.) Anderson chose not to avail herself of assistance that was readily at hand when she realized birth was imminent, either by summoning her parents or the paramedics, and thus failed to act with the due caution and circumspection required of her. Once the baby was born, she violated her duty to provide the necessary medical attention the baby required for survival by failing to take any steps herself to assist the baby, and by failing to summon help. A parent has an inherent duty to provide care for a newborn baby. (See People v. Chavez, supra, 11 Cal.App.2d at p. 627, 176 P.2d 92.) Anderson's failure to care for the baby is evidenced by his death and is sufficient to show she failed in her duty to provide essential care to a newborn.

Insufficient Evidence of Malice
Anderson next argues the verdict of second degree murder must be reversed because there was insufficient evidence of malice. This contention has merit.
Second degree murder is the unlawful killing of a human being with malice aforethought but without the premeditation and deliberation required for first degree murder. (People v. Nieto Benitez (1992) 4 Cal.4th 91, 102, 13 Cal. Rptr.2d 864, 840 P.2d 969.) Malice is express when the defendant manifests a deliberate intention to take away the life of another; it is implied "`when a person does an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his [or her] conduct endangers the life of another and who acts with conscious disregard for life.... [Citations.] Phrased in a different way, malice may be implied when defendant does an act with a high probability that it will result in death and does it with a base antisocial motive and with a wanton disregard for human life. [Citation.]'" (Id at p. 104, 13 Cal. Rptr.2d 864, 840 P.2d 969, emphasis in original.)
The Attorney General argues Anderson was aware her failure to take steps to enable her newborn to continue to breathe endangered his life, her failure to act demonstrated a conscious disregard for his life, and she intended to passively harm the baby because she did not want to have a child. Furthermore, her actions in hiding the baby's body and denying the birth to her mother and the police could be interpreted as a consciousness of guilt. Our attention is invited to People v. Burden, supra, 72 Cal.App.3d 603, 140 Cal.Rptr. 282, in support of the proposition that where a child dies because a parent failed to care for him, and the parent demonstrates a lack of concern as to whether his or her child lives or dies, there is sufficient evidence of implied malice to support the conviction of second degree murder. (Id at pp. 620-621,140 Cal.Rptr. 282.)
The facts in Burden are readily distinguishable from those in the case before us. There, a father allowed his five-month-old son to slowly waste away and starve to death, while admitting "he did nothing about the child's deplorable state, though he could have if he `had really wanted to,' because he `just didn't care.'" (Id at p. 620, 140 Cal.Rptr. 282.) That court found substantial evidence to support the jury's finding "`wanton disregard for human life' is manifest." (Ibid.) On the other hand, *572 what is reasonably expected of a father who watches his infant slowly die over the course of days, weeks or months must be fundamentally different than the expectations in a mother who has just endured the pain, physical exhaustion and trauma of giving birth. As the expert noted, Anderson had, at the most, eight minutes in which to recover from the physical as well as emotional trauma of the delivery, ascertain the infant's needs and then administer the delicate aid of clearing all respiratory passages.
Here, the trial court found implied malice because "the defendant had an awareness of her duty to care for the child; failed to care for the child; there being a high degree of probability that that failure to care would result in death, and it exhibited a wanton disregard for life, and the court finds the defendant to be guilty of second degree murder." Referring to People v. Burden, the court stated that "a parent has an affirmative duty to care for the child, the newborn in this case, and that the failure to take such care isis an act within the meaning of this implied malice."
Absent any expert testimony on the subject, no one sitting on an appellate panel can speculate exactly what a woman should or can do immediately after giving birth, alone and in a weakened state. Contrary to the prosecution's argument, common sense does not fill this gap. We are comfortable in saying that the record in this case is utterly devoid of any testimony, expert or otherwise, of what a woman in extremis could have done within ten minutes of an unassisted birth. It is one thing to say something should be done, but something else to prove in a court of law that something could be done by a given individual in such circumstances. We are not unmindful of the fact Anderson did not go to a hospital to give birth. But to imply malice from the failure of good judgment without any evidence that, had she embarked on such a path, the baby would have lived, is precarious at best. Speculation will not suffice.
The trial court erred in concluding Anderson's failure to care for her child constituted implied malice. The facts the court cited in its ruling gave rise to liability for only involuntary manslaughter; a finding of implied malice required facts indicating a wanton disregard for human life above and beyond the failure to provide immediate aid. The case of Burden was just such an example, where the defendant failed to feed a starving child for weeks because he "just didn't care." While the evidence cited by the trial court is sufficient to support a verdict of involuntary manslaughter, it does not demonstrate the higher standard of a wanton disregard for human life required for implied malice. Accordingly, the verdict of second degree murder is reduced to involuntary manslaughter.

Admission of Incriminating Statements
Anderson argues the trial court committed prejudicial error in allowing the introduction over objection of statements she contends were obtained while she was in custody and in violation of her Miranda rights. We agree with the trial court that at the time the statements were made, Anderson was not in custody for Miranda purposes.
The test for determining whether a defendant was in custody for Miranda purposes "is `how a reasonable [person] in the suspect's position would have understood his [or her] situation.'" (People v. Esqueda (1993) 17 Cal.App.4th 1450, 1481, 22 Cal.Rptr.2d 126, quoting Berkemer v. McCarty (1984) 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317.) "This test assesses the coercive effect of police conduct as a whole, rather than emphasizing particular details of that conduct in isolation." (In re Manuel G. (1997) 16 Cal.4th 805, 821, 66 Cal.Rptr.2d 701, 941 P.2d 880, citing Michigan v. Chesternut (1988) 486 U.S. 567, 573, 108 S.Ct. 1975, 100 L.Ed.2d 565.)
Anderson said she was awakened by Dillon, who was accompanied by a plain-clothes *573 detective. As she left her bedroom with Dillon and the detective, she noticed one uniformed police officer sitting on the couch in the family room, and another one outside of a patio door. A second detective met them at the top of the stairs leading from her bedroom, and the detectives identified themselves as police officers. Anderson and the two detectives sat at the kitchen table, and they told her they had discovered a dead baby in her car and wanted to know what she knew about it. Anderson denied knowing anything about the baby or the clothes Peggy had found in the closet. She gave the officers permission to search the car. Anderson told them she was still pregnant, and pulled her shirt taut against her stomach at the detectives' request. The detectives told her they could have a blood test taken to determine if the baby was hers and whether she was still pregnant. Anderson then told the detectives to go ahead and arrest her.
One of the detectives then asked Anderson if she could talk to her alone. Anderson agreed, and the two stepped out onto the patio so Anderson could smoke a cigarette. At that point, the detective advised her of her Miranda rights. Anderson waived her rights and agreed to speak to the police.
The trial court correctly ruled the statements were admissible. While there were uniformed officers stationed in the house, the detectives sat with her at the kitchen table in her home. She was not handcuffed or placed under arrest. Anderson's mother and Dillon were present in the house. There were no accusations of wrongdoing. The form and intent of the questions indicated they were preliminary in nature. A baby's body had been found in a box in Anderson's car and the police were clearly convinced that she was involved, and no doubt very suspicious that there was wrongdoing, but they had little information at that point. Viewed as a whole, the conduct of the detectives was not coercive. The trial court correctly ruled the statement was admissible.
But assuming arguendo that Anderson was in custody, the admission of the statements did not amount to prejudicial error. After Anderson waived her Miranda rights, she spoke freely to the police, and those statements formed the cornerstone of the prosecution's case. At trial, Anderson never seriously argued she did not give birth to the baby; her defense centered on her mental state and the infant's cause of death. Any error that may have occurred was harmless.

Motion for Acquittal
Anderson argues the trial court erred in denying her motion for acquittal under section 1118 because the evidence presented by the prosecution was insufficient to support a conviction of second degree murder. Because we reverse that conviction, we need not address this argument.

Sentencing Error
Finally, Anderson contends the trial court erred in allowing only 15 percent presentence conduct credits as to the entire sentence imposed, pursuant to section 2933.1.[7] She argues section 2933.1 *574 cannot apply to the concurrent sentence for the felony child abuse conviction because that offense occurred in 1992, prior to the effective date of section 2933.1. Subdivision (d) states, "This section shall only apply to offenses ... that are committed on or after the date on which this section becomes operative." The section took effect in 1994.
We agree with the Attorney General that People v. Ramos (1996) 50 Cal. App.4th 810, 58 Cal.Rptr.2d 24 preempts this argument. There, Ramos argued the court erred in applying the 15 percent limitation to an 8-month consecutive sentence imposed for a felony that did not fall within section 2933.1. (Id. at p. 817, 58 Cal.Rptr.2d 24.) That court held that "by its terms, section 2933.1 applies to the offender not to the offense and so limits a violent felon's conduct credits irrespective of whether or not all his or her offenses come within section 667.5 [i.e., are violent felonies]." (Ibid.)
Upon her conviction of a violent felony in 1995, well after the enactment of section 2933.1, Anderson became a "person who is convicted of a felony offense listed in Section 667.5." As such, she is not entitled to a reduction in credits for the concurrent four-year sentence for the felony child abuse offense committed in 1992.
Anderson argues in the alternative that the ex post facto clauses of the United States and California constitutions prohibit the imposition of section 2933.1 to the 1992 offense. However, the ex post facto clauses have no application here. At the time Anderson committed the 1995 offense that brought her within the reach of 2933.1, she had notice of its penalties.
Anderson's conviction of felony child abuse is affirmed. Her conviction of second degree murder is reversed and reduced to involuntary manslaughter, and the cause is remanded to the trial court for sentencing in accordance with this holding.
RYLAARSDAM, J., and SEYMOUR, J.[*], concur.
NOTES
[*] In denying review, the Supreme Court ordered that the opinion be not officially published. (See California Rules of CourtRules 976 and 977).
[1] All further statutory references are to the Penal Code.
[2] Miranda v. Arizona (1966) 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694.
[3] The baby girl born in 1992 survived and is the subject of the felony child abuse charge. The baby boy born in 1995 died and his death is the subject of the murder charge. To avoid confusion, we refer to them as the '92 baby and the '95 baby. Anderson has not appealed her conviction of felony child abuse in connection with the '92 baby.
[4] The baby girl apparently survived with no ill effects and was subsequently adopted.
[5] To avoid confusion, we refer to Anderson's mother by her first name, Peggy.
[6] Much of Anderson's argument presupposes the infant "stopped breathing within one to two minutes after birth" and "within approximately nine minutes of the time he stopped breathing, all of his brain activity stopped." While the coroner reached this conclusion after being pressed by the trial court, his testimony as a whole reveals some uncertainty as to how long the baby lived following birth. He testified the baby was born alive and was capable of living. The infant took 10 or 12 breaths minimum, because that would be the minimum required to cause the lungs to be as well-aerated and crepitant as they were. When the prosecution asked what caused the baby's death, he said there were "a few factors." One was a "little bit of mucous" in the upper respiratory lumen causing respiratory insufficiency, and another was that there was no food or water given to the baby, which he believed "contributed to the child's death." He testified the baby's lips were dry, which he attributed to dehydration or exposure to extreme heat. When asked to give an estimate as to how long the baby lived, the coroner first said it would "be [a] very rough estimate" because the lungs were well-expanded and brain activity had begun at the time of birth. Once the baby stopped breathing it would then take 8 to 10 minutes for brain death to occur. The court then pressed the coroner: "How long do you think that the infant was breathing?" The coroner said long enough to take 8 to 10 good breaths, and then 10 minutes for the brain to die. "The Court: So it's your opinion that this baby was born alive and died withinThe Witness: Ten-minute period. The Court: within a 10-minute period, but would have stopped breathing within a minute or two? The Witness: That's correct." The defense then established that once the baby stopped breathing, he would have been unable to take any kind of nutrition, negating the coroner's earlier testimony that the lack of food and water had contributed to the infant's death.
[7] Section 2933.1 reads, in its entirety: "(a) Notwithstanding any other law, any person who is convicted of a felony offense listed in Section 667.5 shall accrue no more than 15 percent of worktime credit, as defined in Section 2933. [¶] (b) The 15 percent limitation provided in subdivision (a) shall apply whether the defendant is sentenced under Chapter 4.5 (commencing with Section 1170) of Title 7 of Part 2 or sentenced under some other law. However, nothing in subdivision (a) shall affect the requirement of any statute that the defendant serve a specified period of time prior to minimum parole eligibility, nor shall any offender otherwise statutorily ineligible for credit be eligible for credit pursuant to this section. [¶] (c) Notwithstanding Section 4019 or any other provision of law, the maximum credit that may be earned against a period of confinement in, or commitment to, a county jail, industrial farm, or road camp, or a city jail, industrial farm, or road camp, following arrest and prior to placement in the custody of the Director of Corrections, shall not exceed 15 percent of the actual period of confinement for any person specified in subdivision (a). [¶] (d) This section shall only apply to offenses listed in subdivision (a) that are committed on or after the date on which this section becomes operative."
[*] Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.