Filed 3/11/15  P. v. Starkey CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D066853 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. RIF1201085) |
| ADAM MICHAEL STARKEY, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Riverside, Gary B. Tranbarger, Judge.  Reversed in part and remanded with directions.

Suzanne G. Wrubel, under appointment by the Court of Appeal, for Defendant and Respondent.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland, Scott C. Taylor and Sabrina Y. Lane-Erwin, Deputy Attorneys General, for Plaintiff and Respondent.

# I.

## INTRODUCTION

" 'The rule excluding evidence of criminal propensity is nearly three centuries old in the common law.' " (*People v. Falsetta* (1999) 21 Cal.4th 903, 913 (*Falsetta*).) This is because, as the United States Supreme Court has long recognized, propensity evidence is thought to cause jurors to "prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge." (*Michelson v. U.S.* (1948) 335 U.S. 469, 475-476 (*Michelson*).) In modern times, our Legislature has crafted limited statutory exceptions to this ancient common law rule with respect to certain specific crimes, including domestic violence. (See Evid. Code, § 1109, subd. (a).)[1] However, our Legislature has also adopted "safeguard[s]" (*Falsetta, supra*, at p. 917) to ensure that these statutory exceptions are not used inappropriately so as to deprive a defendant of a fair trial. Among these safeguards is section 1109, subdivision (e), which establishes a presumption that evidence of the defendant's act of domestic violence committed more than 10 years prior to the charged offense is inadmissible. (*People v. Johnson* (2010) 185 Cal.App.4th 520, 539 (*Johnson*).) In determining whether the presumption of inadmissibility has been rebutted, a trial court is required to perform a careful weighing process to assess whether the probative value of the remote evidence of domestic violence outweighs the potential for prejudice stemming from its admission. (*Ibid*.)

---

[1]     Unless otherwise specified, all subsequent statutory references are to the Evidence Code.

2

" ' "The principal factor affecting the probative value of an uncharged act is its similarity to the charged offense." ' "  (*Id.* at pp. 531-532.)

The People charged Adam Michael Starkey with murder, stemming from his shooting of his girlfriend.[2]  During the trial, over Starkey's objection, the trial court admitted evidence that Starkey punched a former girlfriend in the face 14 years prior to the killing, for the purpose of proving his propensity to commit domestic violence.

Starkey's defense against the murder charge was that the shooting was an accident. The trial court instructed the jury on the lesser included offense of involuntary manslaughter on the ground that there was substantial evidence from which the jury could find that the killing resulted from Starkey's criminally negligent discharge of a firearm.  The jury acquitted Starkey of first degree murder, but convicted him of second degree murder.

On appeal, Starkey contends that the trial court erred in admitting evidence of his commission of the prior act of domestic violence because the record does not reflect that the trial court properly applied the presumption of inadmissibility adopted in section 1109, subdivision (e) and the uncharged offense bears little similarity to the charged offense.

---

[2]     The People also charged Starkey with unlawful possession of a firearm (Pen. Code, § 29805).  The jury found Starkey guilty of this offense.  On appeal, Starkey does not raise any challenge to this conviction.

We conclude that the trial court abused its discretion in admitting the evidence. Starkey's punching a former girlfriend in the face 14 years prior to the shooting is remote in time and is dissimilar to the charged offense, and there is nothing in the record demonstrating that the trial court properly applied the presumption of inadmissibility in section 1109, subdivision (e) in admitting the evidence. We further conclude that the error requires reversal because it is reasonably probable that Starkey might have obtained a more favorable result absent admission of the evidence, given the substantial evidence supporting Starkey's accident defense. Accordingly, we reverse the judgment,[3] and remand for a new trial on the murder charge.[4]

## II.

## PROCEDURAL AND FACTUAL BACKGROUND

A. *Procedural background*

A jury found Starkey guilty of the second degree murder (Pen. Code, § 187, subd. (a)) (count 1) of his girlfriend, Jennifer Bowers. Based on a stipulation between the

---

[3] Starkey also contends that the trial court abused its direction in permitting a firearms expert to testify that in her opinion, the bullet that killed the victim did not appear to have ricocheted before striking her. Although we need not address this contention in light of our reversal of the judgment, because this issue is likely to recur on remand, we explain in part III.B., *post*, that the trial court may admit such testimony in a retrial.

[4] In view of the jury's verdict finding Starkey not guilty of first degree murder, he may not be retried for that offense on remand. (See *Stone v. Superior Court* (1982) 31 Cal.3d 503, 510 [double jeopardy precludes retrying a defendant for an offense for which he was acquitted].)

parties, the jury also found Starkey guilty of unlawful possession of a firearm within 10 years of a qualifying misdemeanor conviction (Pen. Code, § 29805) (count 2). With respect to count 1, the jury found that Starkey personally discharged a firearm that caused death within the meaning of Penal Code, section 12022.53, subdivision (d). The trial court sentenced Starkey to an aggregate term of 40 years to life in prison, consisting of 15 years to life on count 1 and a consecutive sentence of 25 years to life for the corresponding firearm enhancement. The trial court stayed a one-year term of local custody on count 2. Starkey timely appealed.

B.      *Factual background*

   1.      *The prosecution's evidence*

      a.      *The shooting*

On the evening of January 24, 2012, Starkey picked up Bowers from work at approximately 5:45 p.m. They then went to a store and bought beer and Jagermeister, a type of hard alcohol, before going home to a trailer in which they lived. While at home, Starkey and Bowers drank beer and Jagermeister. They began to argue, and the argument escalated into a physical altercation.

Starkey retrieved a gun that he owned and asked Bowers to go outside and shoot with him. Bowers angrily told Starkey to put the gun away and emptied the cartridges from the gun. Starkey then reloaded the gun and went outside and shot it several times into the air.

When Starkey reentered the home, Bowers began calling him names. In response, Starkey emptied several bullet casings onto the floor, in order to make Bowers angry. At some point thereafter, while Bowers was either standing or sitting on a couch, Starkey shot Bowers in the head with the gun. She fell onto the couch and died.

        b.     *The 911 call*

Starkey called 911 at 10:18 p.m. and frantically told the operator that he had just shot his girlfriend. He explained that they had been drinking and arguing before the shooting. At one point during the call, when the operator asked, "It was an accident?" Starkey responded, "Well, I didn't mean to. But, like, fuck. I was just angry." Starkey continued, "I wasn't gonna try to shoot her. I was just pointing at her, stupid." At another point during the call, Starkey stated, "We got in a fuckin' argument. I fuckin' pulled out the .38, and I fuckin' shot her."

        c.     *The crime scene*

When police arrived at the trailer, they found the revolver that Starkey used to shoot Bowers on the kitchen counter. The gun contained one spent round and one live round. Three spent casings were on the kitchen counter, one was in the kitchen sink, and two were on the floor of the living room. Six cartridges were in the living room area, and six were in the bathroom. There was also a cardboard sign in the kitchen that said: "Jenny . . . I hate today . . . just sayin'."

A large, empty bottle of Jagermeister was in the trash, as were 30-40 empty bottles of beer.  The police did not find any bullet strikes or holes in the trailer.  Outside the trailer, the police found a hooded sweatshirt with a box of .38 caliber ammunition in the pocket; the box held 50 cartridges but contained only 35 cartridges.

   d.  *Starkey's police interview*

Police interviewed Starkey later that night.  Starkey recalled the events preceding the shooting, including the drinking and the verbal altercation with Bowers.  When an interviewer noted that Starkey had several deep scratches on his face, Starkey stated that Bowers had slapped him during the argument, but that he did not remember her scratching him.  Starkey denied having been physical with Bowers.

With regard to the actual shooting, at one point in the interview, Starkey said that he thought he had just placed the gun onto the counter and it had fired.  However, Starkey agreed with an investigator that this was unlikely, since the bullet would have struck Bowers in the waist rather than in the head.   At other points in the interview, Starkey stated that he believed that he had accidentally shot Bowers while they were standing fairly close together.  Starkey also stated, "We were arguing. And I fuckin—the gun went off.  I shot her."

 When an investigator questioned Starkey about the difference between the shooting being an accident and Starkey having shot Bowers and then regretted it after, Starkey agreed that he told the 911 operator that he was mad and he shot Bowers.  Starkey also said, "It wasn't like it just dropped.  Obviously I mean, I had it in my hands."

7

Starkey continued: "What I mean by accident is like I didn't have any intentions to hurt my girlfriend."

e.    *Bowers's injuries*

Bowers died from a single gunshot wound to the head.  She also had multiple abrasions and/or contusions on her eyelids, mouth, hands, inside her lips, arms, and chest.  Bowers's injuries appeared to have been inflicted anywhere from a few minutes to a couple of hours before her death.  Her blood alcohol level was .06 at the time of her death.

f.    *Forensic evidence*

The bullet entered Bowers at the hairline, toward the top of her skull.  A forensic pathologist opined that based upon the entrance wound and the bullet, it did not appear that the bullet had ricocheted before entering her skull.  In addition, there was no stippling, which indicated that Starkey did not shoot Bowers at very close range.

g.    *Firearm evidence*

As discussed in greater detail in part III.B., *post*, Michele Nichols, a firearms expert, testified concerning the revolver and the ammunition at issue in the case.  Nichols testified that the gun used in the shooting, a 1907 Colt revolver, was functional, and that while the gun had some mechanical problems, she did not believe that it could accidentally discharge.  Nichols also stated that after examining the bullet that struck Bowers, it was her opinion that the bullet had not deflected prior to entering Bowers's skull.

h. *Starkey's blood alcohol evidence*

Starkey's blood alcohol level at 2:51 a.m. was .23. A prosecution criminalist presented testimony from which the jury could infer that Starkey likely had a blood alcohol level of approximately .26 at 10:20 p.m.

i. *Starkey's prior conviction*

The parties stipulated that Starkey had previously suffered a misdemeanor conviction listed in Penal Code section 29805, within 10 years of the current offense.

j. *Section 1109 evidence*

As discussed in detail in part III.A., *post*, the People presented evidence that Starkey punched a former girlfriend in the face approximately 14 years prior to the charged offense for purposes of demonstrating his propensity to commit domestic violence.

2. *The defense*

a. *Intoxication*

A forensic toxicologist testified that if a person were an experienced drinker and had a blood alcohol level of .23, four and one-half hours earlier, that person's blood alcohol level would have been approximately .30 to .34.

b. *Firearms evidence*

Tom Miller, a firearms expert, examined Starkey's gun and noted that it was a very old gun, with worn parts. According to Miller, the gun was "marginally reliable in that it certainly could fail at any time." In addition, Miller stated that it was difficult to remove

9

the cartridges from the cylinder of the gun, and the ejector rod would not always discharge all of the cartridges from the gun.

c.    *Forensic evidence*

Paul Herrmann, a forensic pathologist, testified that due to the irregularity of the entrance of the gunshot wound on Bowers's head, it appeared that the bullet could have ricocheted prior to striking her.

## III.

## DISCUSSION

A.    *The trial court abused its discretion in admitting evidence that Starkey punched a former girlfriend in the face 14 years prior to the killing for the purpose of proving his propensity to commit domestic violence*

Starkey contends that the trial court erred in admitting evidence that he had punched a former girlfriend in the face 14 years prior to the killing, pursuant to section 1109.

1.    *Governing law*

In *People v. Brown* (2011) 192 Cal.App.4th 1222, 1232-1233 (*Brown*), the court provided an overview of the law governing the admissibility of uncharged acts of domestic violence pursuant to section 1109.

> " 'Evidence of prior criminal acts is ordinarily inadmissible to show
> a defendant's disposition to commit such acts.  (Evid. Code,
> § 1101.)[5]  However, the Legislature has created exceptions to this

---

5    Section 1101 provides in relevant part:
    "(a) Except as provided in this section and in Sections 1102, 1103,
    1108, and 1109, evidence of a person's character or a trait of his or

10

rule in cases involving sexual offenses (Evid. Code, § 1108) and domestic violence (Evid. Code, § 1109). [Citation.] '[T]he California Legislature has determined the policy considerations favoring the exclusion of evidence of uncharged domestic violence offenses are outweighed in criminal domestic violence cases by the policy considerations favoring the admission of such evidence.' [Citation.] Section 1109, in effect, 'permits the admission of defendant's other acts of domestic violence for the purpose of showing a propensity to commit such crimes. [Citation.]' [Citations.]"

Section 1109, subdivision (a) provides in relevant part:

"*Except as provided in subdivision (e)* . . . in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352."[6] (Italics added.)

---

her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion.

"(b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act."

[6] Section 352 provides, "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

11

The exception contained in subdivision (e) in provides:

"Evidence of acts occurring more than 10 years before the charged offense is inadmissible under this section, unless the court determines that the admission of this evidence is in the interest of justice."  (§ 1109, subd. (e).)

In *Johnson, supra*, 185 Cal.App.4th at page 520, the court considered the meaning of the "interest of justice" exception contained in section 1109, subdivision (e).[7]  The *Johnson* court stated that "[s]ubdivision (e) establishes a presumption that conduct more than 10 years prior to the current offense is inadmissible."  (*Id*. at p. 539.)  In addition, the *Johnson* court rejected the People's argument that section 1109, subdivision (e) "adds little substantively to the analysis under section 352," and concluded instead, "that a more stringent standard of admissibility applies."  (*Johnson, supra*, at p. 539.)  In reaching this conclusion, the *Johnson* court reasoned in part:

"[S]ome greater justification for admissibility is necessary under subdivision (e) than under section 352.  Balancing under section 352 is required even under subdivision (a), where the presumption runs in favor of admission.  By including a specific 'interest of justice' requirement under subdivision (e), the Legislature must have intended to require a more rigorous standard of admissibility for remote priors." (*Johnson, supra*, at p. 539.)

In describing the nature of this more rigorous standard for admission of evidence of remote acts of domestic violence, the *Johnson* court noted that under section 352, "evidence may be excluded only where its probative value is '*substantially outweighed*'

---

[7]    The *Johnson* court noted, "The parties have not cited any cases specifically addressing the nature of the 'interest of justice' inquiry under subdivision (e), nor have we located any such cases."  (*Johnson, supra*, 185 Cal.App.4th at p. 539.)

12

by its prejudicial effect." (*Johnson, supra*,185 Cal.App.4th at p. 539, italics added.) In contrast, under section 1109, subdivision (e), the *Johnson* court reasoned, "the Legislature intended to allow admission of evidence whose probative value *weighs more heavily* on those same scales." (*Ibid.*, italics added.) The *Johnson* court ultimately concluded, "[T]he 'interest of justice' exception is met where the trial court engages in a balancing of factors for and against admission under section 352 and concludes . . . that the evidence was 'more probative than prejudicial.' " (*Johnson, supra*, at pp. 539-540.) Thus, while under section 352 there is a presumption in *favor* of admissibility that may be overcome only by potential prejudice that *substantially outweighs* the probative value of the evidence, under section 1109, subdivision (e), there is a presumption *against* admissibility that may be overcome only where the probative value of the evidence *outweighs* the potential for prejudice.

    2.    *Standard of review*

We review a trial court's "interest of justice" determination under section 1109, subdivision (e) for an abuse of discretion. (See *Johnson, supra*, 185 Cal.App.4th at p. 539.) In *People v. Diaz* (2014) 227 Cal.App.4th 362, 376-377 (*Diaz*), we described the manner by which this court reviews a trial court's evidentiary ruling for an abuse of discretion:

> "A proper exercise of discretion is ' "neither arbitrary nor capricious, but is an impartial discretion, guided and controlled by fixed legal principles, to be exercised in conformity with the spirit of the law, and in a manner to subserve and not to impede or defeat the ends of substantial justice." ' [Citation.] Exercises of discretion must be

13

' "grounded in reasoned judgment and guided by legal principles and legal policies appropriate to the particular matter at issue." ' " [Citation.]

3.  *Factual and procedural background*

The People filed a motion in limine seeking to admit evidence that, approximately 13 years[8] before the charged offense, Starkey punched a former girlfriend, Andrea Drew, in the face.[9]  The People described the incident as follows:

> "[Drew] and [Starkey] were both drinking alcohol when they began arguing.  Suddenly and without warning, [Starkey] punched [Drew] in the face with his closed fist.  She stated that he punched her very hard and the incident left her with a bruise to her face.  Drew stated that immediately after [Starkey] punched her he appeared to be shocked at what he had done and apologized."

The People contended that this evidence was admissible pursuant to section 1109, subdivision (a) to show Starkey's disposition to commit domestic violence.  The People reasoned that Bowers's killing was the "ultimate act of domestic violence."  The People also argued that the evidence should not be excluded pursuant to section 352 in light of the "strong connection" between the prior act of domestic violence and the charged homicide.  Finally, the People maintained that although the incident occurred more than

---

8      At trial, Drew testified that she dated Starkey approximately 15 years before the trial, which was approximately 14 years before the charged offense.  Drew stated that she dated Starkey for "less than a year," and that she broke up with him shortly after the incident.

9      Drew was identified as Jane Doe in the People's motion.

14

10 years prior to the charged offense, the interests of justice required that the evidence be submitted to the jury.

Starkey filed a motion in limine to exclude the evidence. In the motion, Starkey contended that the "alleged uncharged battery of Andrea Drew" was not factually similar to the charged crime. Starkey also cited section 1109, subdivision (e) and argued that admission of the evidence was not in the interest of justice because the evidence was "highly prejudicial, more prejudicial than probative, [and would] confuse the jury."

At the outset of the trial, outside the presence of the jury, the prosecutor stated to the trial court that she wanted to clarify her understanding that the court would not allow her to present the section 1109 evidence. The court interrupted the prosecutor and stated that its indicated ruling was to admit the evidence.[10]

Later, during trial, outside the presence of the jury, the court again stated that the section 1109 evidence would be admitted, during the following colloquy:

> "[Defense counsel]: The first thing I wanted to address was, I just want to make sure I got this clarity. . . . In regards to Andrea Drew, who's [the prosecutor's] [section] 1109 testimony witness, I had done a [section] 402[11] in regards to this. This is a 14-year-old incident and, essentially, under [section] 1109, incidences [*sic*] more than ten

---

[10]     Specifically, in response to the prosecutor's statement that it was her understanding that the court had denied her request to admit "potential 1109 evidence," the court stated, "No. No. No. [¶] My indicated [*sic*] as to the 1109 evidence is that the defense objection would be overruled . . . "

[11]     Section 402 authorizes the court to determine the admissibility of evidence outside the presence of the jury. Defense counsel was referring to his written motion in limine to exclude the evidence.

15

years old are generally excluded unless the Court makes a ruling that the court—it's relative [*sic*] and material to the case. Specifically, I wanted to find out the Court's ruling.

[The court]: The ruling is it's admissible under [section] 1109."

During the trial, Drew testified that she had dated Starkey approximately 14 years prior to the charged offense, when they were both 18 years old. One night, when they were drinking and socializing with friends, they got into a heated argument. Starkey punched Drew in the face with a closed fist. After the punch, Starkey told Drew, "I'm sorry, I didn't mean to hit you." When Drew asked Starkey why he had hit her, Starkey responded, "I'm sorry. I did not mean to close my fist."

4. *The trial court abused its discretion in admitting the evidence of uncharged domestic violence*

Starkey raises both procedural and substantive arguments in support of his contention that the trial court abused its discretion in admitting the uncharged domestic violence evidence. We agree that the trial court's ruling admitting the uncharged domestic violence evidence was both procedurally and substantively deficient, and constitutes an abuse of discretion.

a. *The record does not demonstrate that the trial court engaged in a proper balancing of factors for and against admission under* Johnson

Starkey contends that the trial court "failed to conduct a proper inquiry on whether admission of the evidence was in the interest of justice." We agree.

16

In *Johnson*, the Court of Appeal considered whether the trial court had conducted a "proper inquiry" in determining whether to admit remote acts of domestic violence in a case in which the defendant was charged with attempted murder and related crimes stemming from the shooting of his girlfriend. (*Johnson, supra*, 185 Cal.App.4th at p. 537) In concluding that the trial court *had* conducted a proper inquiry, the *Johnson* court noted that the trial court had: (1) asked specific questions concerning the interest of justice requirement contained in section 1109, subdivision (e); (2) considered whether the prior acts were similar or dissimilar to the charged offense; (3) heard argument from the People as to how the prior acts were similar to the charged offense; (4) considered whether the evidence was admissible under section 1101; (5) found the evidence relevant on the issue of intent, motive, and lack of mistake; (6) considered the length of time it would take to present the evidence of the uncharged acts; (7) ruled that evidence of the prior acts was not unduly inflammatory; (8) found that admitting the evidence would not mislead the jury; (9) weighed the remoteness of the alleged prior acts and their similarity to the charged crimes and concluded that they were " 'more probative than prejudicial' "; and (10) ruled that evidence that the defendant had committed two shootings of prior girlfriends would be admitted under section 1101, subdivision (b) and 1109, subdivision (e), but that a prior assault in which the defendant "[used] his fists" to punch a prior girlfriend *was not admissible* under other statute "due to 'dissimilarities' in the means of attack and the injuries inflicted." (*Johnson, supra*, at pp. 537- 538.)

In contrast, in this case, the record does not contain any indication that the trial court was " 'guided by legal principles and legal policies appropriate to the particular matter at issue' " in determining whether to admit evidence of Starkey's prior act of domestic violence (*Diaz, supra*, 227 Cal.App.4th at p. 377.) To begin with, unlike in *Johnson*, the trial court did not state that the uncharged domestic violence evidence was " 'more probative than prejudicial' " (*Johnson, supra*, 185 Cal.App.4th at p. 538)—the applicable evidentiary standard. Further, there is nothing in record (including in either the People's briefing or argument) that suggests that the trial court was aware of the "stringent standard of admissibility" discussed by the *Johnson* court. (*Id.* at p. 539.)[12] Moreover, unlike in *Johnson*, the trial court did not state any basis for determining that the presumption of inadmissibility established in section 1109, subdivision (e) had been rebutted, nor did the court even make a finding that the presumption *had* been rebutted. Finally, in stark contrast to *Johnson*, the trial court in this case did not mention a single factor that it had considered in determining whether to admit the evidence.

Under these circumstances, even assuming that a trial court need not expressly state the basis for its ruling that the presumption of inadmissibility established in section 1109, subdivision (e) has been rebutted (cf. *People v. Taylor* (2001) 26 Cal.4th 1155,

---

[12]    The absence of any reference in the record to the applicable evidentiary test has particular significance in this context, since under section 352, evidence whose probative value is slightly outweighed by the potential for prejudice is *admissible*, while under section 1109, subdivision (e) such evidence is *inadmissible*. (See *Johnson, supra*, 185 Cal.App.4th at pp. 539-540.)

1169 ["a court need not expressly weigh prejudice against probative value or even expressly state that it has done so, if the record as a whole shows the court was aware of and performed its balancing functions under Evidence Code section 352"]),[13] the record as a whole does not demonstrate that "the trial court engage[d] in a balancing of factors for and against admission under section 352 and conclude[d] . . . that the evidence was 'more probative than prejudicial.' " (*Johnson, supra*, 185 Cal.App.4th at pp. 539-540; cf. *People v. Jennings* (2000) 81 Cal.App.4th 1301, 1313-1314 [stating that in determining whether to admit propensity evidence under section 1109, "[a] careful weighing of prejudice against probative value under [section 352] is essential to protect a defendant's due process right to a fundamentally fair trial"].)

      b.    *The presumption of inadmissibility established in section 1109, subdivision (e) is not rebutted by admission of evidence Starkey's commission of a remote act of domestic violence dissimilar to the charged offense*

As noted above, section 1109, subdivision (e) establishes a presumption of inadmissibility of evidence of alleged acts of domestic violence committed more than 10 years prior to the charged offense. (*Johnson, supra*, 185 Cal.App.4th at p. 539; see also

---

13    We emphasize that we merely assume, solely for the purposes of this opinion, that a trial court need not state the basis for its ruling that the presumption of inadmissibility under section 1109, subdivision (e) has been rebutted. While the Supreme Court has made clear that a trial court need not expressly state its reasons for refusing to exclude evidence pursuant to section 352 (e.g. *People v. Villatoro* (2012) 54 Cal.4th 1152, 1168), in the section 352 context, "the presumption runs in favor of admission." (*Johnson, supra*, 185 Cal.App.4th at p. 539.) In contrast, as noted in the text, section 1109, subdivision (e) "establishes a presumption that conduct more than 10 years prior to the current offense is inadmissible." (*Johnson, supra*, at p. 539.)

19

*People v. Morton* (2008) 159 Cal.App.4th 239, 248, fn. 4 ["Subdivision (e) of Evidence Code section 1109 specifies that incidents occurring more than 10 years previously are generally inadmissible."].)  In order for admission of such remote acts to be in the interest of justice, the probative value of such evidence must outweigh the potential prejudicial impact.  (*Johnson, supra*, at pp. 539-540.)  " ' "The principal factor affecting the probative value of an uncharged act is its similarity to the charged offense." ' "  (*Id*. at pp. 531-532; see *id*. at pp. 535-536 ["In assessing remote priors, the cases have examined the details of the past misconduct, comparing them to the details of the currently charged offense, to determine whether the similarities in the two incidents 'balance out the remoteness' of the prior offense."].)

We are not persuaded by the People's argument that the prior alleged act of domestic violence was "substantially similar to the charged crimes evidence," because in both instances, Starkey was drinking with a girlfriend, got into an argument, "suddenly became aggressive," and then "immediately expressed remorse."  To state the obvious, punching someone in the face is not similar to shooting someone in the head.

While the People cite *Johnson* in support of the substantive admissibility of the evidence pertaining to the Drew incident, *Johnson* provides no such support.  In *Johnson*, the defendant was charged with a series of crimes related to his shooting of his girlfriend, Nicole Henderson.  (*Johnson, supra*, 185 Cal.App.4th at p. 524-526.)  The *Johnson* court concluded that the trial court had not abused its discretion in admitting evidence that the defendant had committed two prior shootings of former girlfriends more than 10 years

20

prior to the charged offense.  (*Id*. at p. 531.)  The *Johnson* court described the similarities

of the uncharged and charged offenses as follows:

> "In this case the probative value was great.  In each of the prior cases defendant resorted to shooting his girlfriend when she either had decided to break up with him or was actively engaged in an argument with him.  Defendant's drug use was a factor in each incident, either in precipitating the breakup, or because defendant was under the influence at the time of the assault, or both.  In each case a serious injury was inflicted.
>
> "The 1988 prior was especially similar in that it also involved a breakup initiated by a girlfriend because of defendant's drug problem, and defendant threatened her before the shooting, as he did Henderson.  [Footnote omitted.]  In both 1988 and 2007, defendant went out of his way to bring himself into the victim's presence (either at her home or place of work) for the evident purpose of talking her into reconciling or else killing or maiming her if she refused.  In both instances, he fired at close range at a vital body part (head or upper torso), and in both he used a small handgun capable of concealment until he was ready to use it.
>
> "The common factors in all three crimes strongly suggest defendant has a problem with anger management, specifically with regard to female intimate partners, and specifically when he feels rejected or challenged by such a partner.  He has demonstrated a pattern of using guns to exact revenge.  Whatever the psychological forces at work, the Legislature has concluded that in these types of cases, evidence of past domestic violence is particularly probative of the likelihood to repeat such behavior."  (*Id*. at pp. 532-533.)

In contrast, the trial court in *Johnson* ruled *inadmissible* a remote act of domestic

violence in which the defendant allegedly "punched [a former girlfriend] in the jaw twice

during an argument, fracturing it in two places."  (*Johnson, supra*, 185 Cal.App.4th at

p. 530.)  The trial court ruled that evidence of this incident was "inadmissible because it

did not involve a weapon."  (*Ibid*.)

Clearly, the alleged act of domestic violence in this case is far more similar to the assault and battery that the trial court in *Johnson* found *inadmissible* than it is to the prior similar shootings that the *Johnson* court concluded had properly been admitted. Indeed, we are not aware of any case, and the People have cited none, in which a trial court has ruled that evidence of a remote act of domestic violence so dissimilar to the charged offense as is at issue in this case was admissible in light of section 1109, subdivision (e).

In addition to the remoteness of the prior incident and a lack of similarity to the charged act, the probative value of the Drew incident as propensity evidence is reduced by the fact that it did not involve the same victim as the charged offense nor did it constitute evidence that Starkey had engaged in a similar pattern of conduct over time. (Compare with *People v. Hoover* (2000) 77 Cal.App.4th 1020, 1029 [concluding trial court did not abuse its discretion in admitting prior domestic violence evidence pursuant to section 1009 in case in which "the subject evidence involved defendant's history of similar conduct against the same victim"; *Johnson, supra*, 185 Cal.App.4th at p. 532, fn.8 ["The propensity inference is particularly appropriate in the area of domestic violence because on-going violence and abuse is the norm in domestic violence," quoting legislative history of section 1109.].) Further, admission of the evidence did not serve the principal purpose of section 1109, namely "to address the difficulties of proof in domestic violence prosecutions and the repetitive nature of domestic violence." (*People v. Ogle* (2010) 185 Cal.App.4th 1138, 1146.)

Weighing against the minimal probative value of the evidence is the significant potential for prejudice. In assessing prejudice, relevant factors include: (1) the inflammatory nature of the uncharged conduct; (2) the possibility that the jury might confuse the prior acts with the charged acts; (3) the remoteness in time of the uncharged offenses; and (4) whether the defendant had already been convicted and punished for the prior offense. (See, e.g., *People v. Culbert* (2013) 218 Cal.App.4th 184, 192; *People v. Rucker* (2005) 126 Cal.App.4th 1107, 1119.) While certainly not as inflammatory as the charged offense, Starkey's act in punching Drew undoubtedly had the potential to evoke a strong emotional bias against him among jurors.

Although there is little likelihood that the jurors would confuse the charged and uncharged offenses, the remoteness of the uncharged offense and the fact that there was no evidence that Starkey had been convicted of the prior offense served to further increase the potential for prejudice. (Compare with *People v. Jennings*, *supra*, 81 Cal.App.4th at p. 1315 [the jury's "knowledge that appellant had already pleaded no contest and been punished for his prior transgressions substantially mitigates the kind of prejudice usually associated with the introduction of prior bad act evidence"].)

In sum, evidence that Starkey had punched a former girlfriend 14 years before the charged offense had insufficient probative value to outweigh the manifest potential for prejudice and rebut the presumption of inadmissibility in section 1109, subdivision (e).

c. *Conclusion*

In conclusion, the record contains no statements or other indication from the trial court concerning the probative value of the evidence or its obvious potential for prejudice. Further, the trial court did not explain how admission of the evidence serves the interests of justice, and we discern no basis on which the trial court could have made such a determination. While trial courts are vested with substantial discretion in determining whether to admit prior domestic violence evidence, there are limits to such discretion. (See *People v. Lang* (1989) 49 Cal.3d 991, 1050 [observing that the abuse of discretion standard of review in the evidentiary context "calls for deference—but it does not, and cannot, require abdication"].) Where a trial court's ruling admitting such presumptively inadmissible evidence of a defendant's commission of uncharged acts lacks either procedural or substantive soundness, an appellate court is compelled to conclude that the trial court has erred. Otherwise, the "realistic safeguard[s]" (*Falsetta, supra*, 21 Cal.4th at p. 918) such as section 352 and section 1109 subdivision (e) that our Legislature adopted in order to ensure due process in this context become empty textual commands, without practical significance. (Cf. *Falsetta, supra*, 21 Cal.4th at p. 917 ["we think the trial court's discretion to exclude propensity evidence under section 352 saves section 1108 from defendant's due process challenge."].)

4. *The error requires reversal*

Erroneously admitted evidence of a defendant's prior acts of domestic violence as propensity evidence pursuant to section 1109 is subject to the *Watson*[14] standard of prejudice.  (See *Ogle, supra*, 185 Cal.App.4th at p. 1145 [stating that any error in admitting uncharged act of domestic violence was harmless under *Watson*]; cf. *People v. Harris* (1998) 60 Cal.App.4th 727, 741 [applying *Watson* standard to sexual offense propensity evidence pursuant to section 1108].)

Under *Watson*, if a trial court erroneously admits evidence, a defendant must show on appeal that it is reasonably probable that he or she would have received a more favorable result if that evidence had been excluded.  (See *Watson, supra*, 46 Cal.2d at p. 836.)  Reasonably probable in this context "does not mean more likely than not, but merely a *reasonable chance,* more than an *abstract possibility.*" (*College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 715, citing *Watson, supra,* 46 Cal.2d at p. 837.) "[U]nder the *Watson* standard a hung jury is considered a more favorable result than a guilty verdict."  (*People v. Soojian* (2010) 190 Cal.App.4th 491, 520.)

The California Supreme Court has repeatedly stressed that evidence of uncharged crimes is inherently prejudicial.  (E.g., *People v. Lewis* (2001) 25 Cal.4th at 610, 637;

---

14      *People v. Watson* (1956) 46 Cal.2d 818.

25

*Falsetta, supra*, 21 Cal.4th at p. 915 ["propensity evidence . . . tends to 'overpersuade' the jury," quoting *Michelson v. U.S., supra*, 335 U.S. at pp. 475-476.)

As discussed in part III.A.3, *ante*, evidence that Starkey had previously punched a former girlfriend in the face was likely to inflame the jury's passions against him.[15] The fact that the prosecutor ended her brief[16] initial closing argument by urging the jury to rely on the inadmissible evidence in finding that Starkey was guilty of the charged crime of murder because he was predisposed to commit such acts served to enhance the potential for prejudice:

> "The fact that he's sorry now doesn't change what he was thinking and what he did. Because we know that's what he does. Right? That's what he did to [Drew]. He punched her in the mouth. Oh, 'I'm sorry.' 'I didn't mean to.' But in this case all the I'm sorrys and I didn't mean tos won't bring Jenny back."

(See *People v. Diaz, supra*, 227 Cal.App.4th at p. 384 ["A prosecutor's reference to evidence that should not have been presented to the jury increases the potential for prejudice flowing from the error."].)

---

[15] Although the People also sought admission of the Drew incident pursuant to section 1101, subdivision (b) on the issues of motive and intent, the trial court admitted the evidence solely as propensity evidence pursuant to section 1109. On appeal, the People do not contend that the evidence was admissible pursuant to section 1101, and we see no possible basis for admission under either theory. (See *People v. Gonzales* (2012) 54 Cal.4th 1234, 1258 ["A person's own prior misconduct may be admissible . . . to show that in light of the prior conduct the person must have harbored a *similar intent or motive* during the charged offense" (italics added).].)

[16] The prosecutor's initial closing argument spanned just three pages of reporter's transcript.

In addition to the extremely prejudicial nature of the improperly admitted evidence, evidence that Starkey acted with malice aforethought in killing Bowers was far from overwhelming.[17]  To begin with, there was undisputed evidence that Starkey was extremely intoxicated at the time of the shooting.  In light of such evidence, it is reasonably probable that jurors had a reasonable doubt as to whether Starkey acted with express malice.  (See Pen. Code, § 29.4 [evidence of a defendant's voluntary intoxication is admissible concerning whether defendant harbored express malice].)

With respect to implied malice,[18] the record contains considerable evidence, apart from Starkey's voluntary intoxication, that would support a finding that Starkey accidently shot Bowers.[19]  Starkey repeatedly characterized the shooting as an accident,

---

[17]    The jury was instructed pursuant to CALCRIM No. 520 that it could find Starkey guilty of murder if it found that he caused the death of another person while acting with malice aforethought. The jury was also instructed pursuant to CALCRIM No 520 that, "There are two kinds of malice aforethought, express malice and implied malice. Proof of either is sufficient to establish the state of mind required for murder."

[18]    The jury was instructed pursuant to CALCRIM No. 520 concerning implied malice as follows:
            "The defendant acted with implied malice if:
            "1. He intentionally committed an act;
            "2. The natural and probable consequences of the act were
            dangerous to human life;
            "3. At the time he acted, he knew his act was dangerous to human
            life; and
            "4. He deliberately acted with conscious disregard for human life."

27

both during his initial 911 call ("I didn't mean to do it," "And it was a fuckin' accident"), and in his interview with police ("It was just a complete accident," " I swear to God it was a fucking accident man," "I just killed my girlfriend on accident," and "It must have went off when I was just puttin' it down. . . My intentions were not to fuckin' shoot her.").

Further, it is undisputed that Starkey called 911 after the shooting and that he repeatedly expressed both remorse and extreme sadness concerning Bowers's death in his interview with the police—actions from which a jury could find that he did not harbor implied malice at the time of the shooting. (See, e.g., *People v. Burden* (1977) 72 Cal.App.3d 603, 620-621 ["A defendant's lack of concern as to whether the victim lived or died, expressed or implied, has been found to be substantial evidence of an 'abandoned and malignant heart' by the appellate courts of this state"]; *People v. Ogg* (1958) 159 Cal.App.2d 38, 51 ["Defendant's failure to seek the assistance of his friends or to obtain medical aid even though he knew that his wife was seriously injured indicates a heartless attitude and callous indifference toward her"].)

Further, the record contains physical evidence consistent with Starkey's contention that the shooting was accidental. Bowers died from a single gunshot wound. Herrmann's

---

19    Evidence of voluntary intoxication, even to the point of unconsciousness, cannot negate implied malice. (See *People v. Carlson* (2011) 200 Cal.App.4th 695, 705 ["the 1995 amendments to [former] section 22 [current section 29.4] preclude a defendant from relying on his or her unconsciousness caused by voluntary intoxication as a defense to a charge of implied malice murder."].)

testimony that the bullet may have ricocheted before striking Bowers supported Starkey's defense that he had not intended to shoot Bowers. In addition, the jury could have inferred from Miller's testimony that Starkey had inadvertently failed to discharge live cartridges from the revolver after firing it outside the residence and thus did not appreciate that the gun was loaded.[20] Such testimony supported the defense's contention that there was a reasonable doubt as to whether Starkey intentionally fired what he knew to be a loaded firearm at Bowers.

The fact that the trial court instructed the jury on the lesser included offense of involuntary manslaughter premised on Starkey having negligently discharged a firearm indicates that the trial court determined that there was substantial evidence from which a reasonable juror could conclude that the shooting was accidental and thus, that Starkey committed involuntary manslaughter. (See *People v. Thomas* (2012) 53 Cal.4th 771, 813 ["An instruction on a lesser included offense must be given only if there is substantial evidence from which a jury could reasonably conclude that the defendant committed the lesser, uncharged offense but not the greater, charged offense"].) In short, this was not a

---

20     Defense counsel asked Miller, "So based on your examination of this gun, if there [was] a live round still left in the cylinder and an individual went to eject all those live rounds or all of the rounds out of the . . . gun but there was a live one in there, that live round may not eject, but empties might. Correct?"
Miller responded, "Yeah. It may—it may not."

29

case in which the record contains overwhelming evidence that Starkey committed a murder.[21]

As the *Johnson* court warned, "[E]vidence of prior misconduct surely could result in reversible error in a close case." (*Johnson, supra*, 185 Cal.App.4th at p. 540.) For the reasons outlined above, we are compelled to conclude that it is reasonably probable that the jury would have reached a result more favorable to Starkey in the absence of the erroneous admission of the evidence pertaining to his having punched a former girlfriend in the face. Starkey is entitled to a new trial during which the People may attempt to prove his guilt without the aid of inadmissible evidence.

B.      *On remand, the prosecution's firearm expert is not precluded from stating her opinion that the bullet that struck Bowers did not ricochet before striking (the victim.)*

Starkey contends that the trial court abused its discretion in overruling his objection to the prosecution's firearm expert testimony that the bullet that struck Bowers had not ricocheted before striking her. Although we need not address this contention in light of our reversal of the judgment on other grounds, we consider whether the prosecution's firearm expert may testify in a similar manner at a new trial on remand.

1.      *Factual and procedural background*

As mentioned in part II.B.1.g., *ante*, at trial, Nichols, a firearms expert, testified during the People's case-in-chief. Nichols explained that she had focused her career on

---

[21]    We note also that the jury acquitted Starkey of first degree murder, asked a question concerning the difference between second degree murder and voluntary manslaughter, and asked for a definition of second degree murder.

firearms beginning about 11 years ago, and that she had worked with firearms and continued her education related to firearms during this period. Nichols stated that her work included examining guns for functionality, examining different components of firearms, and comparing fired components (e.g. bullets and casings) to determine the type of firearm that had fired the bullet. Nichols testified that the revolver that Starkey had used on the night of the incident appeared to be functioning properly.

During their case-in-chief, the People also called Marc McCormick, a forensic pathologist, who performed the autopsy of Bowers's body. McCormick stated that, based on the bullet and the entrance gunshot wound, he did not see anything that indicated that the bullet had ricocheted prior to striking Bowers.

Herrmann, the defense expert, testified in contrast that based on the type of entrance gunshot wound and the lacerations surrounding it, the bullet that struck Bowers might have ricocheted before striking her.

In rebuttal, the People recalled Nichols as a witness. The prosecutor asked Nichols whether she had any training in ammunition, including understanding different types of ammunition and understanding what happens when ammunition is fired. Nichols responded in the affirmative. Nichols stated that during a year of training before she started casework, she had read literature, attended group meetings, watched presentations, and read published journal articles. Nichols also stated that she had experience examining bullets and cartridges, and testified concerning the difference between jacketed and unjacketed bullets.

31

Nichols examined the bullet recovered from Bowers's head. Specifically, Nichols viewed the bullet under a low-powered microscope and looked for fragments imbedded in the bullet. Nichols also noted the shape of the bullet, the caliber, and the weight. According to Nichols, the bullet was unjacketed, lead, .38 caliber, and weighed 130 grams. In addition, the bullet had substantial damage to the nose, which appeared to have bone fragments embedded in it. Nichols explained that it was common to find deformities in unjacketed bullets that have struck a hard surface.

The prosecutor then asked Nichols, "And based on your training and experience, were you able to form an opinion as to whether the bullet you examined in this case deflected before it hit bone?"

After responding in the affirmative, Nichols stated that in her opinion, "[The bullet] struck nose first, probably bone. It was not deflected prior to entering the victim's skull."

Defense counsel objected on the ground of "[l]ack of foundation," and "[b]eyond the scope of the witness's credibility."[22] The trial court overruled the objection.

2. *Governing law*

Section 720 states:

> "(a) A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates. Against the objection of a party, such special knowledge,

---

[22]  Rather than *credibility*, we assume defense counsel intended to object on the ground that the testimony was outside the scope of Nichols's *expertise*.

skill, experience, training, or education must be shown before the witness may testify as an expert.

"(b) A witness' special knowledge, skill, experience, training, or education may be shown by any otherwise admissible evidence, including his own testimony."

"Whether a person qualifies as an expert in a particular case . . . depends upon the facts of the case and the witness's qualifications. [Citation.] The trial court is given considerable latitude in determining the qualifications of an expert and its ruling will not be disturbed on appeal unless a manifest abuse of discretion in shown." (*People v. Bloyd* (1987) 43 Cal.3d 333, 357 (*Bloyd*).)

In *Bloyd*, a ballistics expert testified concerning the possible trajectory of a bullet that killed the victim. Although the expert had stated that "external ballistics was not his area of specialty"[23] (*Bloyd, supra*, 43 Cal.3d at p. 357), he explained that he had a "great deal of experience" concerning "the motion of [a] bullet through the air."[24] The expert also stated that he had training that had provided him with expertise to testify concerning a bullet's trajectory, explaining that he had performed "firing and recovering of many test bullets over the years of different calibers and the motion of those bullets through . . . check devices." (*Id*. at p. 357, fn. 11.)

---

[23]   The *Bloyd* court stated that external ballistics refers to "the motion of a bullet or projectile after it leaves the weapon, including fragmenting and ricocheting." (*Bloyd, supra*, 43 Cal.3d at p. 357.)

[24]   The expert explained that he was not qualified to testify concerning other aspects of external ballistics including " 'muzzle velocity, the speed of the bullets, the force at which certain powder grains impact on certain objects.' " (*Bloyd, supra*, 43 Cal.3d at p. 358.)

On appeal, the defendant claimed that the expert was not qualified to testify as to the trajectory of the bullet because he was not sufficiently qualified in exterior ballistics. (*Bloyd, supra*, 43 Cal.3d at p. 357.) The Supreme Court rejected this contention, noting that the expert had stated that he was an expert on the "motion of the bullet through the air," and that the expert was "candid about the limited area of external ballistics in which he considered himself an expert." (*Id*. at p. 358.)

In *People v. Fuiava* (2012) 53 Cal.4th 622, 672 (*Fuiava*), a prosecutor asked a police sergeant a hypothetical question concerning whether a person might mistakenly identify the location from which a firearm had been fired. (*Id*. at p. 671.) Defense counsel objected on the ground that the question "called for speculation," and "was not [the sergeant's] expertise." (*Id*. at p. 672.) After a sidebar conference, the trial court overruled the objection. The sergeant then drew on "'experience [from] when [he] was working at the training academy,'" and stated that "once we put people under stress and shots are being fired, the determination of where a shot came from, even though we know the shot came from the right, the person might say it came from the left or vice versa. So under times of stress, determining where a shot came from often is not possible." (*Fuiava, supra*, 53 Cal.4th at p. 672.)

On appeal, the defendant contended that the sergeant's opinion was inadmissible because he had "no training or credentials in the science of acoustics or auditory perceptions." (*Fuiava, supra*, 53 Cal.4th at p. 672.) The Supreme Court rejected this

34

argument, reasoning that the sergeant was sufficiently qualified to render this opinion in light of his experience in training deputies at the training academy. (*Id*. at pp. 672-673.)

>    3.    *Application*

Nichols's opinion that the bullet that killed Bowers had not deflected prior to striking her was based on both her examination of the bullet at issue and her significant experience with ammunition. Nichols described in considerable detail both the examination that she performed on the bullet, as well as her training and expertise with ammunition. Nichols's testimony concerning the nature of her expertise and the basis for her opinion was far more detailed than that offered by the sergeant in *Fuiava,* whose testimony the Supreme Court nevertheless ruled had been properly admitted. (*Fuiava, supra*, 53 Cal.4th at p. 672-673.) Therefore, assuming that on retrial Nichols describes her qualifications in a manner similar to that offered in the trial, we conclude that Nichols is not precluded from stating her opinion that the bullet that struck Bowers did not ricochet before striking Bowers. However, in light of the fact that a trial court is given "considerable latitude" (*Bloyd, supra*, 43 Cal.3d at p. 357) in determining the qualifications of an expert, and whether a person qualifies as an expert in a particular case is fact specific, the trial court may reconsider the issue based on the facts and testimony presented on retrial, in light of the principles enunciated above.

IV.

DISPOSITION

The judgment is reversed. The conviction on count 1 (murder) (Pen. Code, § 187) is reversed. The People may retry Starkey on a charge of second degree murder within the time limit set forth in Penal Code section 1382 (i.e., 60 days after the filing of the remittitur unless good cause is shown for a different period or Starkey waives the 60–day requirement). At the conclusion of any further proceedings on count 1, the trial court shall sentence Starkey on any new conviction obtained on remand and shall impose sentence on count 2 (unlawful possession of a firearm) (Pen. Code, § 29805). If the People do not retry Starkey on count 1 within the prescribed time period, the trial court shall impose sentence on count 2 (unlawful possession of a firearm) (Pen. Code, § 29805).

AARON, J.

WE CONCUR:

HUFFMAN, Acting P. J.

O'ROURKE, J.

36